Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

**IN THE CIRCUIT COURT OF MARION COUNTY,
DIVISION 2 AT HANNIBAL, MISSOURI
ASSOCIATE CIRCUIT DIVISION**

| | |
|---|---|
| LINDA COOKE, M.D. & LINDAN, LLC ) ) ) PLAINTIFFS ) ) vs. ) ) Quincy Physicians & Surgeons Clinic, S.C. ) D/B/A QUINCY MEDICAL GROUP ) ) DEFENDANTS ) | CASE NO.: |

## PETITION

**Comes now** Plaintiffs, individually and by and through counsel, The Lemon Law Firm,

James Lemon and being duly sworn upon her oath, states as follows:

1.   Plaintiff requests a jury trial as to all counts triable to a jury.

## COUNT I
## DECLARATORY JUDGMENT

2.   Plaintiff Linda Cooke, is resident of Marion County, Missouri.

3.   Plaintiff Lindan, LLC is a Missouri Limited Liability Company.

4.   That Linda Cooke is one of the principals of and a member of Lindan, LLC.

5.   Defendant is an Illinois Corporation doing business in the State of Missouri.

6.   That in 2010, Defendant approached Plaintiff Linda Cooke and requested that she transfer

her practice from an individual practice to a practice wherein she would remain in place

EXHIBIT A

in the same office building operating with the same name and identity, but as an employee of Defendant.

7. That Defendant's stated goal was to obtain the benefits of the labor of Plaintiff Linda Cooke.

8. That at the time of the negotiations, Plaintiff Linda Cooke was leasing her office space from Lindan, LLC.

9. That as a further part of their offer, that Defendant offered to enter into a lease agreement with Lindan, LLC which would replace the existing lease.

10. That the parties engaged in various negotiations in which Defendant made multiple promises to Plaintiff Linda Cooke in her capacity as a physician and prospective employee, but also as a principal of Lindan, LLC.

11. That such promises were both oral, as well as written in emails from Defendant.

12. That one such promise made to Plaintiffs was that the lease agreement would contain a provision that the lease would terminate "if/when Dr. Cooke leaves QMG".

13. That such promise was made by Carol Brockmiller, f/k/a Carol Lewis in an email December 13, 2010, a copy of which is attached hereto as exhibit "A".

14. That such promise was made as an inducement to get Plaintiffs to sign the relevant documents.

15. That based upon such inducements, Plaintiffs signed the relevant documents, a lease agreement and an employment agreement, attached hereto as Exhibit's "B" and "C" respectively.

16. That when Plaintiff Linda Cooke signed the employment agreement, she specified that it

was signed subject to the assurances made by Carol Lewis in said email, and that a copy was attached thereto.

17. That Defendants accepted such amendment as it was in writing, attached to the contract document, did not refuse the document, and have stated that it is their position that the contract is in effect and binding upon the parties.

18. That such provision was therefore a condition precedent for the contract.

19. That such provision was a material provision to the employment agreement.

20. That when the final lease was drafted by Defendants several months later, in fact Defendant did not include such provision in the lease agreement.

21. That the purported employment agreement is void for failure of a condition precedent.

22. That further, all such affirmations constituted a representation.

23. That as such a provision was not included in the final lease that such representations were therefore in fact false.

24. That Plaintiffs did not know that such affirmations were false, in fact believing the provision was in the lease.

25. That Defendant either knew such affirmations were false, or did not know if they were true or false when they made them.

26. That but for such affirmations, Plaintiff Linda Cooke would not have accepted employment with Defendant and such affirmations were therefore material.

27. That but for such affirmations that the provision was in the Lease, Plaintiff Lindan, LLC would not have entered into the lease agreement.

28. That Defendants intended that the representation be acted on by Plaintiffs and that they

would execute the agreements.

29.     That Plaintiffs relied on the representations, and signed the agreements.

30.     That as the representations were a part of the negotiation between the parties, Plaintiffs had a right to rely on the representations.

31.     That Plaintiffs have been injured by the false allegations, in that Defendants have stated unequivocally that they intend to continue to occupy the building, and do not intend to surrender possession as they promised to do.

32.     That the employment agreement and the lease agreement are therefore void for fraud in the inducement.

33.     That as a result of the foregoing, that there exists an actual case or controversy of judicable nature between Plaintiffs and Defendant concerning the rights and obligations of each party under the alleged employment agreement and the alleged lease.

WHEREFORE, pursuant to Rule 87 of the Missouri Rules of Civil Procedure and Section 527.010 RSMo Plaintiffs prays the Court to enter a judgment in favor of Plaintiffs declaring that the Employment agreement is void, and that the Lease Agreement is void, without further force and effect, and that the costs of this action be taxed to Defendant.

**COUNT II**
**FRAUD**

34.     Plaintiff Linda Cooke restates and realleges paragraphs 1-33 as if restated fully herein.

35.     That all affirmations previously described constituted representations.

36.     That as such a termination provision was not included in the final lease, that such representations were therefore in fact false.

Page 4 of 16

37. That Plaintiff Linda Cooke did not know that such affirmations were false, in fact believing the termination provision was in the lease.

38. That Defendant either knew such affirmations were false, or did not know if they were true or false when they made them.

39. That but for such affirmations, Plaintiff Linda Cooke would not have accepted employment with Defendant and such affirmations were therefore material.

40. That Defendants intended that the representation be acted on by Plaintiff Linda Cooke and that she would proceed with employment with them.

41. That Plaintiff Linda Cooke relied on the representations of Defendant, and signed the employment agreement.

42. That as the representations were a part of the negotiation between the parties, Plaintiff Linda Cooke had a right to rely on the representations.

43. That Plaintiff Linda Cooke has been injured by the false allegations, in that Defendants have unequivocally refused to leave her building unless she sign various documents, and make various concessions which they are not entitled to demand her to sign or to make.

44. That Plaintiff Linda Cooke has been further injured by the false allegations in that she will be forced to rent other space in order to continue practicing medicine, and will incur substantial monetary damages thereby.

45. That Defendants acted with evil motive or intent by their false representations to Plaintiff Linda Cooke.

46. That alternatively, Defendants acted with reckless or callous indifference to the rights of Plaintiff Linda Cooke by their false representations to Plaintiff Linda Cooke.

47. That such evil motive or intent or callous our reckless indifference to the rights of

Plaintiff Linda Cooke is shown by Defendants conduct in showing up unannounced at her office purporting to terminate Plaintiff Linda Cooke, claiming they intended to move all equipment, threatening employees and making other outrageous statements.

48. That such evil motive or intent or callous our reckless indifference to the rights of Plaintiff Linda Cooke is further shown by statements made by Defendants Lawyer when they showed up at her office that "You don't have any rights to be here because we changed that part of the lease agreement", delivered in a condescending tone and manner.

**WHEREFORE**, Plaintiff Linda Cooke prays that the court find that Defendants affirmations were fraudulent, that the court grant Plaintiff Linda Cooke her damages arising from said fraud, that the court award Plaintiff Linda Cooke punitive damages against Defendant, that the court award Plaintiff Linda Cooke reasonable attorney's fees, and that interest accrue on all unpaid amounts at the statutory rate.

<u>COUNT III</u>
<u>FRAUD</u>

49. Plaintiff Linda Cooke restates and realleges paragraphs 1-48 as if restated fully herein.

50. That but for Defendant's Fraudulent Affirmations, that Plaintiff Linda Cooke would not have worked for Defendant either under an employment agreement or otherwise.

51. That Defendants did not bill certain patients properly on behalf of Plaintiff Linda Cooke.

52. That Plaintiff Linda Cooke began to suspect that such billing was being done improperly and demanded that Defendant check their calculations more closely.

53. That Defendants claimed to have further checked and made affirmations to Plaintiff that the calculations were correct.

54. That in fact Defendants did not check their calculations more closely and continued to bill

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

in error, constituting a further representation, which was false.

55. That Plaintiff Linda Cooke believed all such affirmations and relied upon them.

56. That as Defendants were in a position of employer to Plantiff Linda Cooke, she was entitled to rely upon all such representations.

57. That Plaintiff Linda Cooke did not know that such affirmations were false.

58. That Defendant either knew all such affirmations were false, or did not know if they were true or false when they made them.

59. That but for such affirmations, Plaintiff Linda Cooke would not have accepted employment with Defendant and further would not have continued in her employment with them so such affirmations were therefore material.

60. That Defendants intended that the representatios be acted on by Plaintiff Linda Cooke and that she would proceed with employment with them, and further that she would continue providing them the benefits of her labor.

61. That the amount of difference between the correct calculations and the incorrect calculations was as much as $800,000 per year.

62. That but for Defendant's fraud, Plaintiff would have been billing her patients herself and would have billed them properly.

63. That therefore, as a direct result of Defendant's fraud, Plaintiff was damaged in the amount of incorrect billing.

64. That Defendant for a period of 5 years paid Plaintiff Linda Cooke on incorrect calculations, continuing to assure Plaintiff Linda Cooke that such calculations were correct.

65. That based upon such assurances, Plaintiff Linda Cooke continued working for Defendant

and accepting the incorrect amount of compensation.

66. That as a result of the foregoing, Plaintiff Linda Cooke was damaged in an amount greater than $850,000.00 for a period of 5 years, or an amount in excess of $4,250,000.00.

## COUNT IV
## FRAUD

67. Plaintiff Linda Cooke restates and realleges paragraphs 1-66 as if restated fully herein.

68. That during Defendant's attempts to induce Plaintiff Linda Cooke to work for them, they made multiple promises.

69. That one of the promises was that if she would consent to work for them that so long as she went back to private practice and did not join another organization that they would allow her to do so willingly on their part.

70. That further Defendants promised that they would not interfere with her leaving.

71. That such promises were verbal, but also were included in the terms of the purported employment agreement.

72. That all such promises constitute an affirmation.

73. That Defendants did not intend to honor such promises and they were therefore false affirmations

74. That Plaintiff Linda Cooke did not know that such affirmations were false, in fact believing Defendants intended to honor their agreement.

75. That Defendant either knew such affirmations were false, or did not know if they were true or false when they made them.

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

76. That but for such affirmations, Plaintiff Linda Cooke would not have accepted employment with Defendant and such affirmations were therefore material.

77. That Defendants intended that the representation be acted on by Plaintiff Linda Cooke and that she would proceed with employment with them.

78. That Plaintiff Linda Cooke relied on the representations, and signed the agreement.

79. That as the representations were a part of the negotiation between the parties, Plaintiff Linda Cooke had a right to rely on the representations.

80. That Plaintiff Linda Cooke has been injured by the false allegations, in that Defendants have unequivocally refused to leave her building unless she sign various documents, which they are not entitled to demand.

81. That Plaintiff Linda Cooke has been further injured by the false allegations in that she will be forced to rent other space in order to continue practicing medicine, and will incur substantial monetary damages thereby.

82. That Plaintiff Linda Cooke has been further injured by the false allegations as she has been forced to retain legal counsel to force Defendants to leave her premises.

83. That Plaintiff Linda Cooke has been further injured by the false allegations as Defendants actions are interfering with her ability to notify patients and are damaging her Doctor/Patient relationship with them.

84. That Defendants acted with evil motive or intent by their false representations to Plaintiff Linda Cooke.

85. That alternatively, Defendants acted with reckless or callous indifference to the rights of Plaintiff Linda Cooke by their false representations to Plaintiff Linda Cooke.

86. That such evil motive or intent or callous our reckless indifference to the rights of

Plaintiff Linda Cooke is shown by Defendants conduct in showing up unannounced at her office purporting to terminate Plaintiff Linda Cooke, claiming they intended to move all equipment, threatening employees and making other outrageous statements.

87. That such evil motive or intent or callous our reckless indifference to the rights of Plaintiff Linda Cooke is further shown by statements made by Defendants Lawyer when they showed up at her office that "You don't have any rights to be here because we changed that part of the lease agreement", delivered in a condescending tone and manner.

88. That such evil motive or intent or callous our reckless indifference to the rights of Plaintiff Linda Cooke is further shown by their refusals to honor their promises unless Plaintiff Linda Cooke grant various concession to which they are not entitled.

**WHEREFORE**, Plaintiff Linda Cooke prays that the court find that Defendants affirmations were fraudulent, that the court grant Plaintiff Linda Cooke her damages arising from said fraud, that the court award Plaintiff Linda Cooke punitive damages against Defendant, that the court award Plaintiff Linda Cooke reasonable attorney's fees, and that interest accrue on all unpaid amounts at the statutory rate.

## COUNT V,
## CONVERSION

89. Plaintiff Linda Cooke restates and realleges paragraphs 1-89 as if restated fully herein.

90. That prior to being induced by Defendant's false affirmations, Plaintiff Linda Cooke was engaged in a solo practice.

91. That as part of that solo practice, Plaintiff Linda Cooke had a particular telephone number and website address.

92. That such telephone number and website address were advertised by her were known to

her patients, and the community in general.

93. That Plaintiff Linda Cooke expended substantial sums in advertising, and making the phone number and website generally know.

94. That the purported employment agreement between Plaintiff Linda Cooke and Defendant is void and without cause or effect.

95. That Defendants therefore have no right to ownership of said phone number and website.

96. That further however, the said purported employment agreement makes no provision for transfer of ownership of the phone number and website.

97. That further there is no other written agreement wherein such agreement was made.

98. That any such agreement if it existed would be banned therefore by the statute of frauds.

99. That further however, there was no verbal agreement between the parties regarding the phone number and website.

100. That despite all of the foregoing, Defendants have continued to categorically state that they intend to keep the phone number and website.

101. That all such actions are taken with full knowledge that they have no ownership interest in the said property.

102. That the value of said property is in excess of $75,000.00

103. WHEREFORE, Plaintiff Linda Cooke respectfully pray for judgment against Plaintiff in the amount of her damages, that the court further award punitive damages in an amount reasonably calculated to prevent such further behavior, and any other appropriate relief necessary to make Plaintiff Linda Cooke whole, and such other legal and equitable relief as this Court deems just and proper.

## <u>COUNT VI</u>
## <u>DETRIMENTAL RELIANCE/PROMISSORY ESTOPPEL</u>

104. Plaintiff Linda Cooke restates and realleges paragraphs 1-103 as if restated fully herein.

105. That in the process of their attempts to induce Plaintiff Linda Cooke to work for them and share the benefits of her labor, Defendant promised to do all of Plaintiff Linda Cooke's billing for her.

106. That Defendant promised to bill Plaintiff Linda Cooke's patients, insurance providers, and government benefit programs properly for the amounts agreed to by such payors.

107. That based upon Defendant's promises, Plaintiff Linda Cooke shared the benefits of her labor with Defendants.

108. That Plaintiff Linda Cooke relied on such promises.

109. That such reliance was reasonable as Defendants held themselves out as skilled in the process of billing.

110. That Defendant failed in their promise and billed various clients and payors in error.

111. That such billing errors resulted in Plaintiff Linda Cooke being paid substantially less than she would have been paid if the billing had been done properly, and she therefore relied to her detriment.

112. That further, Plaintiff Linda Cooke began to suspect that such billing was being done improperly and demanded that Defendant check their calculations more closely.

113. That Defendants claimed to have further checked and made additional promises to Plaintiff Linda Cooke that the calculations were correct.

114. That Plaintiff Linda Cooke further believed such promises and relied upon them.

115. That it was reasonable for Plaintiff Linda Cooke to rely upon Defendant's assurances.

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

116.	That it was reasonably foreseeable that Plaintiff Linda Cooke would continue to work for Defendants and further that she would be damaged if the billing calculations were made in error.

117.	That in fact Defendant did not check their calculations and in fact continued to calculate in error.

118.	That the amount of difference between the correct calculation and the incorrect calculation was as much as $800,000 per year.

119.	That Plaintiff Linda Cooke has been damaged as a direct and proximate cause of Defendant's failure to live up to their promises.

120.	That Defendant for a period of 5 years paid Plaintiff Linda Cooke on incorrect calculations, continuing to assure Plaintiff Linda Cooke that such calculations were correct.

121.	That based upon such further, Plaintiff Linda Cooke continued working for Defendant and accepting the incorrect amount of compensation.

122.	That as a result of the foregoing, Plaintiff Linda Cooke was damaged in an amount greater than $850,000.00 for a period of 5 years, or an amount in excess of $4,250,000.00.

123.	That despite being made aware of such billing errors, which they have insisted upon passing on to Plaintiff Linda Cooke, resulting in them failing to pay her the compensation she was promised.

124.	That injustice can only be avoided by enforcement of the promise.

125.	That Plaintiff Linda Cooke is entitled to judgment against Defendant in the amount of the difference between what she was owed and what Defendant actually billed.

WHEREFORE, for the reasons above stated, Plaintiff Linda Cooke requests that the court find that Plaintiff was unjustly enriched by the difference in the value of her labor as promised by Defendant, less the amount actually paid to her for such labor by Defendant, and for such other and further relief as the court may deem meet and just.

## COUNT VII
## UNJUST ENRICHMENT

126. Plaintiff Linda Cooke restates and realleges paragraphs 1-125 as if restated fully herein.

127. That as part of their relationship, Defendant has made it their custom and practice to purchase supplies for Plaintiff Linda Cooke to use during the operation of her business.

128. That it has further been Defendant's practice that they keep a "dashboard", wherein they keep track of such supplies as they are provided and deduct that amount from the total amount of compensation paid to Plaintiff Linda Cooke.

129. That such deductions is made as soon as the supplies are provided.

130. That there are currently various supplies at the office building owned by Lindan, LLC.

131. That the cost or value of such supplies has already been deducted from Plaintiff Linda Cooke's dashboard.

132. That as a result, Plaintiff Linda Cooke has already paid for all supplies currently in her possession.

133. That notwithstanding such fact, Defendant has demanded that Plaintiff Linda Cooke purchase all such supplies from Defendant, or has stated in the alternative that it is their intent to withhold such supplies from Plaintiff Linda Cooke.

134. That Defendant by their demands is attempting to force Plaintiff Linda Cooke to pay for the supplies twice.

135.    That such requirement would constitute unjust enrichment to Defendant.

WHEREFORE, Plaintiff Linda Cooke requests the court to find that Defendant has been unjustly enriched, that the court grant Plaintiff Linda Cooke judgment against Defendant in the amount previously paid for such supplies, and for such other and further relief as the court may deem meet and just.

_____
Linda Cooke, M.D., Plaintiff

State of Missouri    )
                     ) ss.
County of Marion     )

Subscribed and sworn to before me, a Notary Public, this __27th__ day of __August__, 2018

_____
Notary Public

> AMBER LEEANN PHILLIPS
> Notary Public - Notary Seal
> STATE OF MISSOURI
> Marion County
> My Commission Expires: May 4, 2021
> 17942114

Linda Cooke, as Member for Plaintiff LINDAN, LLC, being duly sworn, deposes and states to the best of their knowledge, information, and belief, the facts set forth in the foregoing affidavit and petition are true.

LINDAN, LLC

_____
Linda Cooke, M.D., Plaintiff &
Member

State of Missouri    )
                     ) ss.
County of Marion     )

Subscribed and sworn to before me, a Notary Public, this __27th__ day of __August__, 2018

_____
Notary Public

Page 15 of 16

> AMBER LEEANN PHILLIPS
> Notary Public - Notary Seal
> STATE OF MISSOURI
> Marion County
> My Commission Expires: May 4, 2021
> 17942114

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

Respectfully Submitted By:

James P. Lemon: Bar # 40480
Attorney for Plaintiffs
Lemon Law Firm, LLC
119 S. 10th Street
Hannibal, Missouri 63401
Phone: (573) 221-1800
Fax:: (573) 221-6990
james@thelemonlawfirm.net

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

From:    "Lewis, Carol" <CLewis@quincymedgroup.com>
Subject:  FW: Dr. Cooke
Date:    Mon, December 13, 2010 8:28 pm
To:      lindamariemd@gmail.com,danielecooke@gmail.com,delmcooke@railstech.com

Linda and Dan, please see attached a very comprehensive explanation of the compensation plan for physicians. I think this will address the first item on your list of when does the extra pay kick in and under what circumstances, including how ancillaries are handled.

Other items we talked about, since Friday, so that they are in one email:

- Lease - attached. As we discussed, you have first right of refusal if Patty and Luke sell, and I have asked the attorney to make that revision. Conversely, I will ask Patty and Luke if they want the same if you sell (knowing that is highly unlikely). QMG is only interested in ensuring that we receive "second" right of refusal before either party would sell to an outside party. The other item in the lease that I couldn't remember the other day is that it terminates if/when Dr. Cooke leaves QMG.
- Discounts and/or free products/services may be given to anyone that Dr. Cooke (or the NP's) deem appropriate, for fee-for-service services. This is what we do now in Plastics/Med Spa, and the same is true of your practice. Insurance services are of course different and cannot be discounted as a rule.
- Vacation/CMEs - there is no policy currently in place regarding physicians taking vacations and/or CMEs. They are not required to seek permission from anyone. As Aric has said, once your base is met, your production, days out, and CMEs is up to you and the impact it may or may not have on your compensation.
- When the NPs join, the addition of their nurse(s) will be your joint decisions. We have some physicians who want full control, some who only want a few screened applicants from which to choose, and others who want a qualified person to be chosen for them. This is yours to decide, and HR will support and coordinate whatever efforts you need.
- In general, staff for physicians are not hired without physician input, and the typical process when a doc wants to add someone is for the request to be made, we post a job desc for internal applications, run outside ads, and go from there based upon physician involvement. Conversely, when/if anyone needs to be fired, we follow a general protocol to make sure the physician is aware, involved, protected, or driving the process if its at his/her request. HR can often be a defender, driver, supporter, or instigator if the physician wants to be isolated. Again, its up to your comfort level, but everyone on our end understands how very important staff satisfaction is to you. I would say the same is true for most of our docs. Annual eval performances are given with physician involvement on scores and outcomes as well.
- 401K match - yes signing by the end of this year ensures a match for 2011, after the one-year employment.
- Dan passed me the staff names, salaries, and status today so I am running a quick check against our pay ranges to identify any outliers and we'll get those addressed soon. Only one that jumps out at me is the coder/biller, so I'll keep you posted what that looks like. More on staff and pay in coming day.

Let me know what else we need to wrap up.
Thanks,
Carol

-----Original Message-----
From: Williamson, Patty
Sent: Monday, December 13, 2010 3:26 PM
To:   Lewis, Carol
Subject:   RE: Dr. Cooke

Let me know if you need anything else.  Patty

<<Phys compensation Plan - QMG DRAFT (8-16-08).DOC>>

Thanks,

Patty

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

Exhibit "B"

## LEASE AGREEMENT

This Lease Agreement is hereby made and entered into effective as of June 1, 2011, by and between Lindan, L.L.C., a Missouri Limited Liability Company, (hereinafter called the "Lessor"), and Quincy Physicians & Surgeons Clinic, S.C., doing business as Quincy Medical Group, an Illinois Medical Corporation, (hereinafter called the "Lessee") upon the following terms and conditions:

1.  PREMISES. For and in consideration of the rent to be paid and the covenants to be performed by Lessee hereunder, Lessor hereby leases to lessee, and Lessee leases and accepts, subject to the terms and conditions of this Lease, the premises referred to as the Leased Premises, being an improved professional office space measuring a total of approximately 12,408 square feet in size on two floors, as outlined on the attached site plan marked Exhibit A, commonly known as 163 Medical Drive, Hannibal, Missouri 63401, and being a part of the building and other improvements owned by Lessor located on the real estate described in Exhibit B, each of said Exhibits being attached hereto and incorporated herein by reference, and hereinafter sometimes called the "Premises" and sometimes the "Leased Premises".

2.  LEASE TERM. The Lease Term shall be for a period of five (5) years from June 1, 2011 (the "Commencement Date") through May 1, 2016 (the "Initial Term").

3.  RENT AND LATE PAYMENT PENALTY. Lessee shall pay Lessor a monthly rent during the Initial Term of:

    (a)  $12,925 per month from June 1, 2011 through August 31, 2011; and
    (b)  $15,510 per month from September 1, 2011 through May 31, 2016, which rent shall not be decreased but will be subject to increases as provided hereafter.

For each year of the Initial Term or Extended Term (as defined in Section 4) after the first year of the Initial Term, commencing with the year beginning June 1, 2012 and ending May 31, 2013, the amount of rent payable will be increased and such increases will be determined by reference to the percentage changes in the Consumer Price Index published by the United States Government for the All Urban Consumers for Midwest Region, All Items, 1982-84= 100 (the "CPI"). If the standard reference base of 1982-84= 100 is changed, the percentage changes in the CPI shall be calculated thereafter by using officially re-based data. The rental for years subsequent to the first year of the Lease shall be increased each year in June by a percentage equal to the percentage increase in the CPI from June of the previous year to and including May of the year in which the increase in rent takes effect. The CPI for the reference month from which any increase is measured shall be referred to as the First CPI and the CPI for the reference month to (and including) which any price increase is measured shall be referred to as the Second CPI. The percentage increase in the CPI shall be determined as follows:

    (i)    the First CPI shall be subtracted from the Second CPI;
    (ii)   the result obtained from (i) shall be divided by the First CPI; and
    (iii)  the result obtained from (ii) shall be multiplied by 100.

1

All rent provided herein shall be due and payable on the first day of each month during the term of this Agreement. Unless and until Lessee is otherwise notified in writing by Lessor, Lessee shall pay all rent and other amounts payable to lessor under this Agreement by check or draft made payable to Lessor and mailed by Lessee to Lessor's address shown on the signature page hereof.

In addition to the rent hereinabove provided, Lessee shall pay a late payment penalty of ten (10) percent of the amount of any monthly rental payment, or payment of any other obligation of the Lessee provided herein, not paid on or before the fifth day of each month, which late payment penalty shall become immediately due and payable, and failure to pay the same upon demand shall place the Lessee in default of this Agreement.

4. <u>OPTION TO EXTEND</u>.  Lessee shall have the option to extend the term of this Lease for five additional terms of one year each (each, the "Extended Term"), beginning at the end of the Initial Term and continuing at the end of each of the first four Extended Terms, upon all of the terms and conditions hereof, by giving written notice of its intention to so extend at least sixty (60) days prior to the expiration of the Initial Term or Extended Term, as the case may be.

The rent during each Extended Term shall be determined in accordance with Section 3 hereof.

5. <u>USE AND TITLE</u>.

(a) The Leased Premises shall be used and occupied by Lessee solely as a professional medical office, and for no other purpose, without the Lessor's prior written consent, which shall not be unreasonably withheld. Lessee shall promptly comply with all valid regulations, orders, ordinances, and laws of legally-constituted authorities applicable to the use and occupancy of the Leased Premises. Lessor warrants and represents to Lessee that Lessor has full right and lawful authority to enter into this Lease and that Lessor has good and marketable title to the Leased Premises. Lessee shall have and hold quiet and peaceable use and possession of the Leased Premises during the entire lease term; and Lessor warrants and agrees to defend such use and possession of the Lessee against the claims of any and all persons whomsoever.

(b) In addition to the Leased Premises, Lessee shall have the exclusive use of the Parking Area, as shown on Exhibit A, including parking areas, service roads, and other areas constructed for use by Lessee, its employees and business invitees, subject, however, to the terms of this Agreement and reasonable rules and regulations prescribed from time to time by Lessor.

6. <u>TAXES</u>.  Lessee agrees to pay directly to the Marion County Treasurer or other tax collector for Marion County all real estate and ad valorem taxes, including any and all general or special assessments, which may be levied or assessed by any lawful authority for each year during the Initial and any Extended Term, including those assessed against the land and/or

2

All rent provided herein shall be due and payable on the first day of each month during the term of this Agreement. Unless and until Lessee is otherwise notified in writing by Lessor, Lessee shall pay all rent and other amounts payable to lessor under this Agreement by check or draft made payable to Lessor and mailed by Lessee to Lessor's address shown on the signature page hereof.

In addition to the rent hereinabove provided, Lessee shall pay a late payment penalty of ten (10) percent of the amount of any monthly rental payment, or payment of any other obligation of the Lessee provided herein, not paid on or before the fifth day of each month, which late payment penalty shall become immediately due and payable, and failure to pay the same upon demand shall place the Lessee in default of this Agreement.

4. **OPTION TO EXTEND.** Lessee shall have the option to extend the term of this Lease for five additional terms of one year each (each, the "Extended Term"), beginning at the end of the Initial Term and continuing at the end of each of the first four Extended Terms, upon all of the terms and conditions hereof, by giving written notice of its intention to so extend at least sixty (60) days prior to the expiration of the Initial Term or Extended Term, as the case may be.

The rent during each Extended Term shall be determined in accordance with Section 3 hereof.

5. **USE AND TITLE.**

(a) The Leased Premises shall be used and occupied by Lessee solely as a professional medical office, and for no other purpose, without the Lessor's prior written consent, which shall not be unreasonably withheld. Lessee shall promptly comply with all valid regulations, orders, ordinances, and laws of legally-constituted authorities applicable to the use and occupancy of the Leased Premises. Lessor warrants and represents to Lessee that Lessor has full right and lawful authority to enter into this Lease and that Lessor has good and marketable title to the Leased Premises. Lessee shall have and hold quiet and peaceable use and possession of the Leased Premises during the entire lease term; and Lessor warrants and agrees to defend such use and possession of the Lessee against the claims of any and all persons whomsoever.

(b) In addition to the Leased Premises, Lessee shall have the exclusive use of the Parking Area, as shown on Exhibit A, including parking areas, service roads, and other areas constructed for use by Lessee, its employees and business invitees, subject, however, to the terms of this Agreement and reasonable rules and regulations prescribed from time to time by Lessor.

6. **TAXES.** Lessee agrees to pay directly to the Marion County Treasurer or other tax collector for Marion County all real estate and ad valorem taxes, including any and all general or special assessments, which may be levied or assessed by any lawful authority for each year during the Initial and any Extended Term, including those assessed against the land and/or

2

building comprising the Premises. For the year 2011 and the final year of the Lease, the taxes shall be prorated between Lessor and Lessee based upon the number of months during such year Lessee leased the Premises. In the event any tax, except income taxes, shall be assessed upon rent by any governmental authority to the within premises, said tax shall be paid by Lessee as additional rental, in the same proportion as hereinbefore provided. In the event Lessee shall elect to contest the taxes, any expense incurred in such contest, including reasonable attorneys' fees or appraisers' fees shall be borne by Lessee.

In addition to its share of all taxes described in the preceding paragraph, Lessee agrees to pay all real estate and ad valorem taxes, including any and all general or special assessments, which may be levied or assessed by any lawful authority upon any leasehold improvements made by the Lessee during the term of this Lease.

7.  **INSURANCE.**

(a)     At all times during the Initial Term and any Extended Term, Lessee shall maintain in force and effect at its own cost and expense all fire and extended coverage insurance required to insure the fair market value of the building shown on Exhibit A, except that Lessor shall reimburse Lessee for one-sixth of the monthly premiums for the months of June through August, 2011.

(b)     At all times during the Initial Term and any Extended Term, Lessee shall maintain in force and effect, at its own cost and expense, a policy or policies of Public Liability Insurance for the protection, indemnification and defense of Lessee and Lessor (with Lessor named as an additional insured) against all claims and causes of action arising out of or in connection with the use, maintenance, operation and occupancy of the Premises, which policy or policies shall have limits of not less than $4,000,000.00 combined limits coverage per occurrence for bodily injury liability and property damage liability. At Lessor's request, Lessee shall name Lessor's mortgagee as an additional insured under any policy of liability insurance.

(c)     Lessee shall keep and maintain in force and during the Initial Term and any Extended Term, plate glass insurance upon windows and doors in the Leased Premises, delivering certificates of such insurance to Lessor.

8.  **LESSEE'S DUTY OF REPAIR AND MAINTENANCE.** Except as provided in paragraph 10 of this Lease as being required of the Lessor, Lessee shall:

(a)     keep and maintain in good order, condition and repair (including any such replacement and restoration as is required for that purpose) the Leased Premises and every part thereof and any and all appurtenances thereto wherever located, including, but without limitation, the exterior and interior portions of all doors, door checks, windows, plate glass, storefront, all plumbing and sewage facilities within the Leased Premises including free flow up to utility owned sewer line, fixtures, heating and air conditioning and electric systems (whether or not located in the leased premises), sprinkler system, walls, floors, and ceilings, meters applicable to

3

Lessee's premises, and all installations made by Lessee under the terms of this Lease and any exhibits thereto, as herein provided; any repairs required to be made in the Premises due to burglary of the premises or other illegal entry into the Premises or any damage to the Premises caused by a strike involving the Lessee or its employees. Any charges to furnish service to the Leased Premises made by any utility company or municipality shall be paid by Lessee within the time limit specified by each utility company. Lessee shall contract with a service company for reasonable maintenance of the heating, ventilation, and air conditioning equipment, with a copy of the service contract to be furnished to Lessor.

(b) Lessee shall keep and maintain the Leased Premises in a clean, sanitary and safe condition and in accordance with all directions, rules and regulations of the proper officials of the governmental agencies having jurisdiction, at the sole cost and expense of Lessee, and Lessee shall comply with all requirements of law, by statute, ordinance or otherwise, affecting the Leased Premises and all appurtenances thereto. If Lessee refuses or neglects to commence and to complete repairs promptly and adequately, Lessor may, but shall not be required to, make and complete said repairs and Lessee shall pay the cost thereof to Lessor as an additional rent upon demand.

(c) Lessee agrees to maintain at its cost and expense during the Initial Term and any Extended Term of this Lease the Parking Area... Such expenses shall include, without limitation, the operating, lighting, repairing, replacing, and maintaining the Parking Area, specifically including landscaping, parking lot, line painting, lighting, traffic control, if any, sanitary control, removal of snow, trash, rubbish, garbage and other refuse, costs of all rentals of machinery equipment in such maintenance, and the cost of necessary personnel to implement such services.

(d) Lessee hereby acknowledges that Lessor has caused to be installed smoke detectors as required by law in the leased Premises, and has instructed Lessee in the use, operation and maintenance of the same. Lessee hereby covenants and agrees to repair and maintain said smoke detectors in proper working condition during the term of this Lease, and specifically to test said smoke detectors not less frequently than monthly, to insure that the same are continually maintained in proper working order. If the Lessee shall at any time determine that any of said smoke detectors are not in proper working condition, the Lessee shall immediately cause the same to be repaired or replaced and notify Lessor by telephone, confirmed in writing, of such malfunction, and of the corrective action taken to cause said smoke detectors to be in proper working order.

9.    SURRENDER OF PREMISES. At termination of this Lease, the Lessee hereby agrees to deliver the Leased Premises in the same condition as received by it on the Commencement Date (subject to the removals hereinafter required) as the Leased Premises were on the date of this Lease, reasonable wear and tear excepted, and shall surrender all keys for the Leased Premises to Lessor at the place then fixed for the payment of rent and shall inform Lessor of all combinations of locks, safes and vaults, if any, in the Leased Premises. Lessee during the last thirty (30) days of such term shall remove all its trade fixtures, and, to the extent required by

4

Lessor by written notice, any other installations, alterations or improvements provided herein, before surrendering the Leased Premises as aforesaid and shall repair any damage to the Leased Premises caused thereby. Lessee's obligation to observe or perform this covenant shall survive the expiration or the termination of the Lease. Any items remaining in the Leased Premises on the Termination Date of this Lease shall be deemed abandoned for all purposes and shall become the property of Lessor and the latter may dispose of the same without liability of any type or nature.

10.     **LESSOR'S DUTY TO REPAIR.** Lessor shall keep and maintain the foundation, exterior walls and roof of the building on the Premises exclusive of doors, door frames, door checks, windows, and exclusive of window frames located in exterior building walls, in good repair except that Lessor shall not be called upon to make any such repairs occasioned by the act or neglect of Lessee, its agents, employees, invitees, licensees or contractors. Lessor shall not be called upon to make any other improvements or repairs of any kind upon the Leased Premises and appurtenances. Any of the foregoing repairs required to be made by reason of the negligence of Lessee, its agents, employees, invitees, licensees, or contractors, as above described, shall be the responsibility of the Lessee notwithstanding the provisions above contained in this paragraph. "Exterior Walls", as used in this paragraph shall not be deemed to include the building front, plate glass, window cases or window frames, doors or frames, security grills or similar enclosures.

11.     **COVENANT AGAINST LIENS.** If, because of any act or omission of Lessee, any mechanic's lien or other lien, charge or order for the payment of money shall be filed against Lessor or against the Premises or any part thereof, Lessee shall, at its own cost and expense, cause the same to be discharged of record or bonded in a manner sufficient to allow a title insurer to insure against said claim within thirty (30) days after written notice from Lessor to Lessee of the filing thereof. Failure to do so shall constitute an event of default under this Lease except that if Lessee is contesting any such lien in a manner which is reasonable and such contest forestalls foreclosure or enforcement of said lien, then such lien shall not constitute a default under this Lease. Lessee shall indemnify and save harmless Lessor from any and all such liens, and expenses, costs, damages or fees (including reasonable attorneys' fees and expenses) arising from a failure to comply with the requirements of this Section.

12.     **EMERGENCY LIGHTING.** In the event that any governmental regulations from time to time shall require emergency lighting to be installed in the Leased Premises, the installation and maintenance of the same, including providing a battery power, shall be the responsibility of Lessee.

13.     **FIXTURES AND IMPROVEMENTS.** Lessee may, after first obtaining Lessor's written approval and consent, at its own cost and expense, install equipment, furniture, and fixtures on the Leased Premises and make any alterations, additions, or improvements in and to the Leased Premises, providing such work is done in a proper manner and without impairing the structural integrity of the improvements then located on the Premises. All such equipment, furniture and fixtures shall remain the property of Lessee and shall be removed by Lessee, at its

5

own cost and expense, during the last thirty (30) days of the term of this Lease; and if any damage to improvements results from such removal, Lessee shall repair such damage immediately at its own cost and expense.

14. SUBORDINATION. Upon request of Lessor, Lessee agrees to execute and deliver a written agreement subordinating this Lease and Lessee's rights under this Lease to any real estate mortgage hereafter placed upon the land and buildings comprising the Premises; provided, however, that such subordination shall be granted upon the express conditions that, so long as Lessee shall not be in default hereunder, this Lease shall be recognized by the holder of any such mortgage, and that the rights of the Lessee hereunder shall remain in full force and effect according to the provisions of this Agreement, notwithstanding any default upon or foreclosure under any such mortgage.

15. LIABILITY OF LESSEE AND INDEMNIFICATION.

(a) Indemnification of Lessor. Lessee shall protect, indemnify and save Lessor harmless from and against any and all liability and expenses of any kind arising from injuries or damages to persons or property on the Leased Premises, arising out of or resulting in any way from any act or omission of the Lessee, its agents, servants and employees, in connection with the use of the real estate described in Exhibit B and any of the improvements contained thereon, including, without limitation, that portion referred to as "Premises" and Parking Area contiguous thereto.

(b) Notice of Claim or Suit. Lessee agrees to promptly notify Lessor of any claim, action, proceeding or suit instituted or threatened against the Lessor. In the event Lessor is made a party to any action for damages which it has herewith indemnified Lessor against, the Lessee shall pay all costs and shall provide effective counsel in such litigation or shall pay, at Lessor's option, the attorney fees and costs incurred in connection with said litigation by Lessor.

(c) Property of Lessee. Lessee agrees that all property owned by it in, on or about the premises shall be the sole risk and hazard of the Lessee. Lessor shall not be liable or responsible for any loss or damage to Lessee, or any one claiming under or through Lessee, or otherwise, whether caused by or resulting from a peril required to be insured hereunder, or from water, steam, gas, leakage, plumbing, electricity or electrical apparatus, pipe or apparatus of any kind, the elements or other similar or dissimilar causes, and whether or not originating in the demised premises or elsewhere, irrespective of whether or not Lessor may be deemed to have been negligent with respect thereto, unless Lessor shall be deemed to have been grossly negligent with respect thereto, or such damage or loss is the result of an intentional and willful wrongful act of Lessor.

16. CASUALTY LOSSES.

(a) Repairs After Casualty. In the event of damage to the building or other improvements on the Premises resulting from fire or other casualty, Lessee shall give written

6

notice thereof to Lessor within ten (10) days after the casualty damage. Lessor shall have the option of repairing such damage. If Lessor elects to repair such damage, the work shall be performed promptly and diligently; and if requested to do so by Lessor, Lessee shall act as agent of Lessor for the purpose of making such repairs. If, within thirty (30) days after said notice to Lessor of the casualty damage, Lessor does not notify Lessee in writing of Lessor's election to repair such damage, Lessee must elect by written notice to Lessor, within thirty (30) days after expiration of Lessor's option period, (a) to repair such damage promptly and diligently, or (b) to terminate this Lease and to surrender all insurance proceeds to Lessor. If either party elects to repair such damage, the Premises shall be rebuilt and restored by the electing party or its agent at its own cost to a condition, as least as good as the condition of the Premises immediately prior to said casualty, and the party actually electing and making such repairs shall be entitled to use the full amount of the insurance proceeds in connection therewith. Within 70 days after such damage occurs, if neither party has elected to repair such damage, then this Lease shall terminate; and all insurance proceeds shall be surrendered to Lessor to be used at Lessor's sole discretion for any purpose.

(b) **Rent After Casualty.** If the damage and/or the repairs necessitated thereby make it impracticable or impossible for Lessee to resume normal, full-scale business operations on the Leased Premises within 24 hours after such damage occurs, rentals accruing hereunder after the expiration of such 24-hour period shall be adjusted as follows: (1) If Lessee's business operations can reasonably be continued on a curtailed or limited basis, the rentals hereunder shall be reduced in proportion to the reduction in Lessee's business volume, measured in terms of gross receipts, or (2) if Lessee's business operations cannot reasonably be conducted on a curtailed or limited basis, the rentals hereunder shall be abated entirely until Lessee's normal full-scale business operations can be resumed; provided, however, that in no event shall rentals be adjusted or abated under this provision for a period of more than ninety (90) days, unless the repair and reconstruction is delayed because of events outside of the reasonable control of the party responsible for said repair or reconstruction, in which event, the rentals shall be adjusted or abated during the period of the additional delay; notwithstanding anything herein contained to the contrary, in the event that Lessor is the party responsible for the repair and reconstruction, if said repair is not completed within 180 days after the date of the fire or other casualty, Lessee shall have the option of terminating the Lease as of said date, with an abatement of rent from the date that the Premises were rendered untenantable.

(c) **Waiver of Subrogation.** Lessee hereby releases Lessor from any and all liability or responsibility to Lessee, or anyone claiming through or under Lessee, by way of subrogation, or otherwise, for any loss or damage to property caused by fire or any of the extended coverage supplementary contract casualties, provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as releasor's policy shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair such policy or prejudice the rights of the releasor to recover thereunder. Lessee agrees that it will request its insurance carrier to include in such policy, such a clause dealing with waiver of subrogation.

7

17.   CONDEMNATION.

(a)   If a portion of the demised premises shall be taken as herein provided for public improvements or otherwise under the exercise of the right of eminent domain and the Premises shall continue to be reasonably suitable for the use which is herein authorized, then the rental herein provided shall be reduced from the date of such taking in direct proportion to the reduction in usefulness of the premises.

(b)   If the Leased Premises or a part thereof sufficient to render the Leased Premises wholly unfit for the use herein authorized shall be condemned or acquired by grant or otherwise, for the widening of streets or for other public improvements, or shall otherwise be taken in the exercise of the right of eminent domain, Lessee shall have the right, at Lessee's option, to terminate and cancel this Lease on thirty days written notice to Lessor, and, under this Lease, Lessee shall be liable only for rents and other charges accrued and earned to the date of surrender of possession of said premises to Lessor and for the performance of other obligations maturing prior to said date.

(c)   Lessee shall not be entitled to participate or receive any part of the damages or award which may be paid to or awarded Lessor by reason of a taking under this paragraph except where said award shall provide for moving or other reimbursable expenses for the Lessee under applicable statute in which event the latter sum shall be received by Lessee.

18.   SIGNS.  Lessee shall not place on any exterior door, wall or window, or any other part of the Premises any sign or advertising matter without first obtaining Lessor's written approval and consent.  Lessee agrees to maintain such sign or advertising matter as provided by Lessor in good condition and repair.  All signs shall comply with applicable ordinances or other governmental restrictions and the obtaining of such requirements and the prompt compliance therewith shall be the responsibility of the Lessee.

19.   DEFAULT.  If Lessee shall be declared bankrupt, be placed in receivership or take advantage of any law for the relief of debtors, or if Lessee should default in the performance of any covenant or condition of this Lease (except for default in the payment of any rent or other amount due to Lessor hereunder, and such default is not cured within ten (10) days after Lessor's service of written notice of default upon Lessee), and such default is not cured or removed within thirty (30) days after Lessor's service of written notice of default upon Lessee, Lessor shall have the right and option to pursue all of its legal remedies including, without limitation, the right to terminate this Lease, to re-enter the Premises, to evict Lessee and to remove Lessee's possessions, all without being deemed guilty of any trespass and without prejudice to any claim by Lessor for damages for breach of this Lease or for arrears of rent or any other amounts due hereunder.

Waiver by Lessor of any default, breach or failure of Lessee under this Lease shall not be construed as a waiver of any subsequent or different default, breach or failure.  In case of a breach by Lessee of any of the covenants or undertakings of Lessee, Lessor nevertheless may

8

accept from Lessee any payment or payments hereunder without in any way waiving Lessor's right to exercise the right of re-entry hereinbefore provided for by reason of any other breach or lapse which was in existence at the time such payment or payments were accepted by Lessor.

20.  **HOLDING OVER.**  In the event Lessee continues to occupy the Premises after the last day of the Initial Term, or any Extended Term, and Lessor elects to accept rental thereafter, a tenancy from month to month shall be created at the same rental and upon the same other terms and conditions existing on the last day of the Initial Term or Extended Term as herein provided.

21.  **LESSOR'S RIGHT OF ENTRY.**  After twenty-four (24) hours advance or written notice to Lessee, Lessor reserves the right at all reasonable times during the term of this Lease, or any renewal term, for Lessor or Lessor's agents to enter the Premises for the purpose of inspecting and examining the same.  During the ninety (90) days prior to the expiration of the term of this Lease or any renewal term, Lessor may exhibit the Leased Premises to prospective lessees or purchasers, and place upon any part of the Premises the usual notices advertising the Premises, or any part thereof, for sale or lease, as the case may be, which notices Lessee shall permit to remain thereon without molestation.  If Lessee's agents or employees are not personally present to open and permit an entry into the building on the Premises, or the Leased Premises, at any time, when in emergency situations entry therein shall be necessary, Lessor or Lessor's agents may enter the same by a master key, or may forcibly enter the same, without rendering Lessor or such agents liable therefor, and without in any manner affecting the obligations and covenants of this Lease.  Nothing herein contained, however, shall be deemed or construed to impose upon Lessor any obligation, responsibility or liability whatsoever for the care, maintenance or repair of the Premises or any part thereof, except as otherwise herein specifically provided.

22.  **ASSIGNMENT.**  Lessee shall not assign or sublet or encumber this Lease without the prior written consent of Lessor, which shall not be unreasonably withheld, and shall not sublet or allow any other lessee to come in with or under Lessee without like prior written consent which shall not be unreasonably withheld.  Consent of Lessor to one assignment or subletting of the Leased Premises shall not constitute a waiver of Lessor's rights hereunder.  Any assignment or subletting, notwithstanding the consent of the Lessor, shall not in any manner release the Lessee herein from its continued liability for the performance of the provisions of this Lease and any amendments or modifications.  The acceptance of any rental payments by Lessor from any alleged assignee shall not constitute approval of the assignment of this Lease by the Lessor.  Notwithstanding the above, if Lessee is acquired by or merged with and into another entity (the "Successor"), this Lease Agreement shall continue, without Lessor's consent, with the Successor.

23.  **BANKRUPTCY, ETC.**  Neither this Lease, nor any interest therein, nor any estate created hereby, shall pass to any trustee or receiver in bankruptcy, nor to any other receiver or assignee for the benefit of creditors or otherwise by operation of law.  In the event of bankruptcy or assignment for the benefit of creditors, the Lessor shall be deemed a secured creditor as to the next six months' rental to the extent permitted by the applicable federal or state laws unless a

9

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

Lessee paying at least the amount due from Lessee shall be procured in such period. As to any additional loss of rent, Lessor shall be entitled to file as a general creditor.

24. ENFORCEMENT. In the event either party to this Lease obtains legal counsel to enforce any right under this Lease or to obtain relief for the breach of any term, condition or covenant herein, the party ultimately prevailing in such proceedings shall be entitled to recover from the other party the reasonable costs and expenses of such proceedings, including reasonable attorney fees, whether or not a lawsuit is actually filed.

25. NOTICES. Any notice given hereunder shall be in writing and may be sent by certified or registered mail, postage prepaid, addressed to the party to receive same at the address of such party shown on the signature page hereof or such other address as such party may hereafter furnish to the other in writing. Any notice mailed in accordance with the preceding sentence shall be deemed to have been served at the time it is received.

26. EXECUTION. This Agreement may be executed in multiple originals as of the date first above written and shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors, assigns and legal representatives. Subject to Section 22 hereof, the rights of either party hereto may be assigned in whole or In part; but no such assignment shall relieve the assignor of any liability hereunder. If Lessee herein shall be more than one party, then the obligations of such parties herein shall be joint and several. The paragraph captions used herein are for convenience only and shall not be deemed to have been included for any other purpose.

27. RIGHT OF FIRST REFUSAL TO PART OR ALL OF THE REAL ESTATE. If, during the Initial Term or Extended Term of this Lease, the Lessor desires to sell part or all of the real estate described on Exhibit "" Lessee shall have a right of first refusal to purchase part or all of the Real Estate, according to the following terms.

(a) Third Party Offer. If, at any time during the term hereof, Lessor: (i) desires to sell part or all of the Real Estate; and (ii) receives from a third party a bona fide offer for the purchase thereof which offer Lessor is willing to accept ("Bona Fide Offer"), then Lessor shall disclose the terms of such Bona Fide Offer to Lessee by providing Lessee with a photocopy of such Bona Fide Offer within seven (7) days following Lessor's receipt thereof.

(b) Solicited Offer. If, at any time during the term hereof, Lessor: (i) desires to sell part or all of the Real Estate; (ii) intends to seek a Bona Fide Offer from a third party; and (iii) has established a minimum price and terms therefore ("Solicited Offer"), then the Lessor shall disclose such Solicited Offer to Lessee in writing at least thirty (30) days before such Solicited Offer is sought from a third party.

(c) Purchase. Lessee shall have fourteen (14) days after being given notice of the Bona Fide Offer or Solicited Offer, as the case may be ("Notice of Offer"), within which to elect to purchase such part or all of the Real Estate described in the Bona Fide Offer or Solicited

10

Offer, as the case may be, on terms identical to those offered by the third party or to be solicited ("Election Period"). Lessee shall make such election by giving written notice thereof to the Lessor ("Election Notice") within the Election Period. Within fourteen (14) days thereafter, the parties shall enter into a formal contract for sale containing the provisions normally used in such contracts in Marion County, Missouri and expressly including all of the terms of the original Bona Fide Offer or Solicited Offer except as the parties may otherwise mutually agree.

      (d)   Failure to Purchase. The following shall apply should Lessee fail to exercise its right of first refusal after receiving a Notice of Offer as set forth above:

      (i)   Bona Fide Offer. If Lessee fails to give the Election Notice as provided in subparagraph 27(c)(iii) above, with respect to a Bona Fide Offer, the Lessor shall be relieved of any obligation to Lessee hereunder and may dispose of part or all of the Real Estate in accordance with the Bona Fide Offer. If the sale to the third party per the Bona Fide Offer is not closed for the same price and upon the same terms as set forth in the Bona Fide Offer or within six (6) months after expiration of the Election Period, then this right of first refusal shall be deemed reinstated and part or all of the Real Estate shall remain subject to this Lease as if no Bona Fide Offer had been made.

      (ii)   Solicited Offer. If Lessee fails to give the Election Notice as provided in subparagraph 27(c)(iii) above, with respect to a Solicited Offer, the Lessor shall be relieved of any obligation to Lessee hereunder and may dispose of part or all of the Real Estate within one (1) year after the expiration of the Election Period provided the material terms and conditions of the Solicited Offer are followed. If the terms and conditions for the Solicited Offer are not followed or the sale consummated in accordance therewith within such one year period, this right of first refusal shall be deemed reinstated. In connection therewith, this right of first refusal shall apply as to any lower price or materially different terms and conditions from those provided in the Solicited Offer of which Lessee was given a Notice of Offer. In short, the Lessor shall not be entitled to accept less than the purchase price established and subject to the material terms of the Solicited Offer or to close a sale based thereon more than one (1) year after the expiration of the Election Period without again extending to Lessee this right of first refusal.

    28.   RIGHT OF FIRST REFUSAL TO INTEREST IN LINDAN, L.L.C. If, during the Initial Term or Extended Term of this Lease, any member of Lindan, L.L.C. desires to sell any or all of his, her or their interest in Lindan, L.L.C., the other members of Lindan, L.L.C. shall proportionately have a right of first refusal to purchase that interest, according to the same terms as the Right of First Refusal for part or all of the Real Estate detailed above, and if none of the members make the Election Notice within the Election Period to purchase the selling member's or members' interest in Lindan, L.L.C., Lessee shall then be given the Notice of Offer and thereafter have the Election Period to deliver the Election Notice to the selling member or members of Lindan, L.L.C. to purchase his, her or their interest in Lindan, L.L.C.

29.  **MISCELLANEOUS.**

(a)  <u>No Partnership</u>.  It is understood that Lessor does not in any way or purpose become a partner or a joint venture with Lessee in the conduct of Lessee's business.

(b)  <u>Partial Invalidity</u>.  If any term or condition of this Lease or the application thereof to any person or event shall to any extent be invalid and unenforceable, the remainder of this Lease in the application of such term, covenant or condition to persons or events other than those to which it is held invalid or unenforceable shall not be affected and each term, covenant and condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(c)  <u>Successors</u>.  Subject to Section 22 hereof, the provisions, covenants and conditions of this Lease shall bind and inure to the benefit of the legal representatives, successors and assigns of each of the parties.

(d)  <u>Supercede Prior Lease</u>.  This Lease Agreement shall supercede and replace the Lease Agreement dated January 1, 2009 by and between Lessor and Linda Cooke Dermatology, P.C., d/b/a Riverside Dermatology.

(e)  <u>Applicable Law</u>.  This agreement and each and every part thereof shall be construed in accordance with the laws of the State of Illinois.

SIGNATURES ON FOLLOWING PAGE

LESSOR
LINDAN, L.L.C.,
A Missouri Limited Liability Corporation,


By:_____

    8795 CR 418
    Hannibal, MO 63401


The undersigned as Lessee under Lease
Agreement dated January 1, 2009 signs to
affirm agreement to this Lease Agreement

LINDA COOKE DERMATOLOGY, P.C.
d/b/a Riverside Dermatology

By:_____
    Linda M. Cooke, its _____

LESSEE
Quincy Physicians & Surgeons Clinic, S.C.,
doing business as QUINCY MEDICAL
GROUP, an Illinois Medical Corporation,


By:_____

    1025 Maine
    Quincy, IL 62301


The undersigned Members of Lindan, L.L.C.
sign to affirm their agreement to Sections 27
and 28 of this Lease Agreement.

_____
Linda M. Cooke, Member, Lindan, L.L.C.


_____
_____ Cooke, Member, Lindan, L.L.C.


_____
Patricia Terstriep, Member, Lindan, L.L.C.
6930 Horseshoe Valley Road
Quincy, IL 62305


_____
Luke Terstriep, Member, Lindan, L.L.C.
6930 Horseshoe Valley Road
Quincy, IL 62305

**EXHIBIT A**

**SITE PLAN**

## EXHIBIT B

## LEGAL DESCRIPTION

Exhibit B

All of Lot Five (5) In B. & B. Subdivision, a subdivision lying in the Northeast Quarter (NE-1/4) of the Southwest Quarter (SW-1/4) of Section Twenty-Seven (27), Township Fifty-Seven (57) North, Range Five (5) West, City of Hannibal, Marion County, Missouri, per plat recorded in Plat Book 9, page 31, Marion County Records.

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

Exhibit "C"

## ASSOCIATE PHYSICIAN EMPLOYMENT AGREEMENT

THIS AGREEMENT is made effective December 6, 2010, between Quincy Physicians & Surgeons Clinic, S.C., an Illinois medical corporation, d/b/a Quincy Medical Group, with its offices located at 1025 Maine Street, Quincy, Illinois, hereinafter termed "Employer," and **LINDA COOKE, M.D.,** hereinafter termed "Employee."

WITNESSETH:

WHEREAS, the Employee has previously owned and practiced medicine in a solo practice in Hannibal, Missouri; and

WHEREAS, the Employee desires to accept employment to practice medicine as Associate Physician-Employee of the Employer; and

WHEREAS, the Employer and the Employee have agreed to the terms of such employment;

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements hereinafter contained, the parties hereto agree as follows:

1. **EMPLOYMENT.** The Employer hereby employs the Employee, and the Employee hereby accepts employment from the Employer upon the terms and conditions set forth.

2. **TERM.** The term of this Agreement shall begin on the 30th day of December 2010, (the "Practice Commencement date"), and shall continue until December 31, 2011, and from calendar year to calendar year thereafter, subject, however, to termination at any time for any reason upon sixty (60) days prior written notice by either the Employer to the Employee or the Employee to the Employer, unless otherwise limited by this Agreement. In addition, and in way of limitation hereof, this Agreement may be immediately terminated by the Employer upon the occurrence of any one or more of the following events:

(a) The failure of the Employee to comply with the Employer's rules and regulations, Code of Conduct, Compliance Program or Compliance Policies and Procedures;

(b) Suspension or revocation of Employee's license to practice medicine in the State of Missouri;

(c) Employee's professional misconduct or Employee's violation of the canons of professional ethics;

(d) The inability of the Employer to secure malpractice insurance coverage for the Employee;

1

(e)  The failure of the Employee to become American Board certified within the requirements of his/her specialty; and

(f)  The death of the Employee.

3.  **COMPENSATION.**

(a)  For all services rendered by the Employee under this Agreement up to and including December 31, 2011, the Employer shall pay to Employee the greater of (i) an annual salary of Four Hundred Eighty Thousand Dollars ($480,000) or (ii) the amount the Employee would have earned under the Employer's income distribution formula (compensation plan) for its shareholders, as if Employee was a shareholder of Employer. Such compensation shall be payable in the manner determined by the Board of Directors of Employer.

(b)  After December 31, 2011, for all services rendered by the Employee under this Agreement, the Employer shall pay the Employee, as if he/she was a shareholder of Employer, such compensation based on the Employee's professional service charges and collections as is determined in accordance with the Employer's income distribution formula (compensation plan) for its shareholders. Such compensation shall be payable in the manner determined by the Board of Directors of Employer.

(c)  The Employer will maintain a copy of the income distribution formula in effect from time to time on file in corporate administrative offices for the Employee's review.

(d)  Upon the termination of this Agreement for any reason whatsoever, the Employer shall pay to the Employee, or in the event of the Employee's death to his/her estate, compensation earned to the date of termination or the date of death, as the case may be.

4.  **DUTIES.**  The Employee accepts employment in the practice of medicine in which the Employer is engaged in the specialty of Dermatology.

The Employee shall have such duties as the Board of Directors of the Employer shall from time to time designate for him/her.

In addition, the Employee is empowered to actively practice medicine on behalf of the Employer. The Employee will not engage in the practice of medicine except as an Employee of the Employer unless otherwise authorized by Employer. The Employer shall have the power to determine what specific duties shall be performed by the Employee. The Employer shall have the power to determine the assignment of patients to the Employee, and the Employee must perform services for the patients assigned to him/her by the Employer. The power to direct, control and supervise the duties to be performed, the manner of performing said duties, and the terms for performing said duties, shall be exercised by the Employer. In performance of the Employee's duties, the Employee agrees to follow the performance and availability standards set by the Board of Directors of the Employer from time to time.

2

Duties herein shall in all events be consistent with the general practice of medicine and the Employee's area of specialty, and shall be performed in accordance with the customary rules of ethics and conduct of the American Medical Association and such other bodies, formal, informal, governmental or otherwise to whom they look for direction, guidance, and to whom they are subject for licensing and control.

5.   COVENANTS OF EMPLOYEE.  The Employee agrees as follows:

(a)   Employee shall abide by and comply with the rules and regulations, Code of Conduct, Compliance Program, and Compliance Policies and Procedures of the Employer, as each may be amended and in effect from time to time.  The Employee shall attempt to work harmoniously with all employees of the Employer and shall support the maintenance of a supportive working environment.  The Employee shall not engage in conduct which damages the reputation of the Employer, which portrays negatively the business policies or decisions of the Employer or which affects adversely the performance of other employees of the Employer.

(b)   During the term of this Agreement, the Employee shall not, without prior written consent of the Employer, which consent may be withheld at the sole discretion of the Employer, engage in or in any manner be connected or concerned, directly or indirectly, whether as an officer, director, stockholder, partner, owner, employee, creditor, or otherwise, with the operation, management, or conduct of any business that competes with or is of a nature similar to that of the Employer;

(c)   During the term of this Agreement, and following the termination hereof for any reason, the Employee shall not make any use, for his/her own benefit or for the benefit of a business or entity other than the Employer, of any confidential information, client, patient, or customer lists, or in any other data of or pertaining to the Employer, its business and financial affairs, or its services, not otherwise known to the general public, and which was acquired by him/her during his/her affiliation with the Employer;

(d)   To maintain in good standing the Employee's license to practice medicine in the State of Illinois.

(e)   To maintain in good standing the Employee's privileges to practice medicine in the hospital in Hannibal, Missouri, or in any other hospital in which the Employer requests that the Employee have privileges to practice medicine;

(f)   To cooperate fully with any special advisory committee appointed by the Board of Directors of Employer to evaluate and review the professional conduct or performance of the Employee or of another physician-employee of the Employer; and

(g)   To adhere to any standards of practice and disciplinary sanctions established by the Board of Directors of the Employer.

3

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

6. **PROFESSIONAL LIABILITY INSURANCE.** While Employee is employed by Employer, Employer shall provide professional liability insurance under a claims-made policy for the Employee covering the acts or omissions of the Employee in the normal course of his/her employment. Employer's obligation to provide such insurance shall cease upon Employee's termination of employment with Employer. The limits of such insurance coverage shall be in an amount per occurrence and aggregate as the Employer determines from time to time. Employer is not responsible for providing professional liability insurance covering the Employee for claims made for Employee's acts or omissions which occurred prior to the date of Employee's employment with Employer. If the employment of Employee by Employer under this Agreement is terminated for any reason with or without cause, Employee shall be responsible for and make payment for all of the premium for Employee's tail insurance coverage, including, but not limited to, that portion of the insurance premium that will cover any claims which are made against Employee after Employee's termination of employment hereunder and which pertain to the Employee's acts or omissions while he was employed by Employer.

7. **VACATIONS AND PROFESSIONAL MEETINGS.** The Employee shall be granted three weeks time for vacation and up to two weeks for attendance at professional meetings. Neither vacation time nor professional meetings time may be accumulated from year to year. Employee's vacation and meeting attendance will be approved by the Medical Director and scheduled at such time as will least interfere with the business of Employer.

8. **EMPLOYEE BENEFITS.** As an Employee of Employer, Employee shall, upon meeting any applicable eligibility and enrollment requirements, be entitled to participate in any qualified retirement, cafeteria, health, accident, or other employee benefit plan, as Employer may have in effect from time to time.

9. **EXPENSES.** Employee understands and acknowledges that Employee shall incur and personally pay certain necessary expenses which are attributable to the performance of Employee's duties hereunder but which may or may not be reimbursed by Employer, such as automobile and transportation expenses; professional entertainment and promotional expenses; home telephone bills; costs of maintaining facilities for consultation with and treatment of patients in Employee's home; educational expenses incurred for the purpose of maintaining or improving Employee's professional skills; club dues and expenses of membership in civic groups, medical societies and fraternal organizations; computer; and all other items of reasonable and necessary professional expenses incurred by Employee in the interest of the medical practice of Employer.

10. **FEES.** All fees, compensations, or other things of value received or realized as a result of the rendition of professional medical services and related services by Employee shall belong to and be paid and delivered to the Employer.

11. **PROHIBITION AGAINST ASSIGNMENT.** This Agreement and all rights and benefits hereunder are personal to Employee, and neither this Agreement, nor any right or interest of Employee herein, or arising hereunder, shall be voluntarily or involuntarily sold, transferred or assigned.

12. **FILES AND RECORDS.** All files and records produced and created by Employee in connection with this Agreement shall belong to and remain the property of

4

Employer. On termination of this Agreement, Employee shall not be entitled to keep or reproduce such files and records, unless the person, firm or corporation relative to which the services were performed requests that a copy be provided to Employee. In such case, Employee shall be required to pay the cost of reproducing any files and records.

13.     <u>COVENANT NOT TO COMPETE.</u>

(a)     Employee acknowledges and agrees that the Employer will incur significant expenses in promoting the medical practice of the Employee. Further, Employee acknowledges that Employee will develop goodwill and a patient following due primarily to the Employer. The Employee, as a material inducement to other physician-employees of the Employer to become employed by the Employer and, as a material inducement for the Employer to employ the Employee, enters into the following covenant for the purpose of protecting the goodwill and patient following of the Employer, and for other good and sufficient reasons in the event the Employee's employment with the Employer is terminated. This covenant is considered reasonable by Employee, and Employee acknowledges that the restraint hereby imposed would not be injurious to the public because the Employee's services could be equally useful to the public interest in some location other than the prohibited area, and the enforcement hereof would not result in the public in such area having inadequate medical protection.

(b)     Except as provided in subparagraph (k) of this paragraph 13, Employee covenants and agrees that if he/she terminates his/her employment with Employer for any reason, or Employer terminates Employee pursuant to paragraph 2, subparagraphs (a), (b), (c), (d), or (e) Employee will not for two (2) years commencing with the employment termination date engage in, or become associated with, directly or indirectly (whether as an owner, employee, partner, officer, director, advisor, stockholder, creditor, landlord, or any other capacity), either solely or jointly with others, any business or other activity which is in any way competitive with the business or allied businesses of the Employer within twenty-five (25) miles of the corporate limits of the City of Hannibal, Marion County, Missouri, as now or hereafter existing, or engage in the practice of medicine within such territory.

(c)     If the Employer shall institute any action or proceeding to enforce the above covenant or any part thereof, or if said covenant or any part is deemed unenforceable by the court or other tribunal having jurisdiction over such action or proceeding, the Employee agrees that (i) the covenant or any part shall be deemed "rewritten" and modified to the extent necessary to render the same enforceable by such court or other tribunal, or (ii) if such court or other tribunal will not so "rewrite" the covenant, then said covenant shall be modified by the Employer and Employee to the extent necessary to render it enforceable under the laws of the State of Illinois or the State of Missouri, as the case may be.

(d)     Employee hereby acknowledges that the obligations to the Employer hereunder and the rights and privileges granted to the Employer hereunder are of a special, personal, unique and extraordinary character. Therefore, anything herein to

5

the contrary notwithstanding, the Employer shall be entitled to seek injunctive or other equitable relief in an appropriate court to prevent a further breach by the terminated Employee. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights and remedies that the Employer may have for damages or otherwise.

(e)     Employer and Employee acknowledge that in the event of a violation of this covenant, the damages caused by such breach are incapable or very difficult of accurate estimation. As a reasonable forecast of just compensation caused by a breach, the Employer and Employee have agreed upon liquidated damages as herein provided.

(f)     In the event the Employee fails to strictly observe this covenant, the Employee shall be liable for liquidated damages which equal fifty percent (50%) of the average of the last three (3) years earnings of such Employee from the Employer (or average of the number of years or partial years Employee is employed by Employer if less than three (3) years) for each year, or part thereof, of the two (2) year non-compete period immediately following the termination date, during which such terminated employee shall violate the terms of this covenant.

(g)     The payment of liquidated damages as provided for above shall not limit any right to injunctive or other equitable relief for further or continued breach of the covenant. In the event that this covenant is breached after such injunctive or equitable relief is obtained, the Employer and Employee agree that the Employer may recover from the Employee a sum equal to the liquidated damages provided for above.

(h)     The Employer reserves the right to withhold any liquidated damages of the terminated Employee violating the covenant to the extent possible from any amount due to the terminated Employee pursuant to the terms hereof and apply any amount withheld to such obligation.

(i)     The Employer acknowledges that this covenant is intended only to apply to an Employee who voluntarily terminates or retires, and to an Employee whose employment is immediately terminated by Employer upon the occurrence of one of the events set forth in paragraph 2, subparagraphs (a), (b), (c), (d), or (e). It is not intended that it will apply to an Employee who is terminated by the Employer upon giving sixty (60) days notice as provided in paragraph 2. The Employer and Employee consider this distinction reasonable.

(j)     The Employee understands that these are restrictive covenants and fully agrees to their applicability. In the event that the Employee violates any of these restrictive covenants, then in any suit which may be brought by the Employer for the violation of these provisions in any court having jurisdiction, then in such respect, the Employee agrees that an order may be made in such suit enjoining him/her from violating said provisions, and an order to that effect may be made pending the litigation as well as a final determination thereof, without the requirement to post bond, and furthermore that such application for such injunction

6

shall be without prejudice to any other right of action which may accrue to the Employer or its successors by reason of the breach of these provisions. If the Employee is found to have violated this Agreement and the Employer prevails in an action to enforce the terms of this Agreement, the Employee shall pay to the Employer its reasonable attorneys' fees and costs incurred by the Employer in prosecuting such action.

(k)     Notwithstanding subparagraph (b) of this paragraph 13, the Employee shall not be restricted upon termination of employment from returning to a solo practice of medicine in Hannibal, Missouri similar to the practice which Employee owned prior to becoming employed by Employer pursuant to the terms of this Agreement. However, if Employee during the two (2) year period from the termination of her employment by Employer practices medicine within the restricted territory in a practice other than a solo practice, the Employee shall be held to the covenant set forth in this paragraph 13 for such period of time as Employee is in violation of the covenant restrictions.

14.     WAIVER OF BREACH. The waiver of either Employer or Employee of a breach of any provision of this Employment Agreement shall not operate or be construed as a waiver of any subsequent breach by either Employer or Employee.

15.     NOTICE. Any and all notices, designations, offers, acceptances or any other communication provided for herein shall be given in writing by registered or certified mail, return receipt requested, which shall be addressed, in the case of the Employer, to its registered office in the State of Illinois and in the case of Employee, to his/her last known place of residence as reflected on the Employer's records. E-mail may be used where agreed to by the Employee and the Employer. The Employer and Employee will use "a request for a read receipt" option when sending a notice by e-mail to the other. Upon receipt of an e-mail requesting a "read receipt" the receiving party, whether it be the Employer or Employee, agrees to have returned to the sender the "read receipt" so that the sender will have written confirmation that the notice by e-mail was received by the receiving party.

16.     GOVERNING LAW. This Agreement shall be subject to and governed by the laws of the State of Illinois, irrespective of the fact that Employee is a resident of a different state.

17.     BINDING EFFECT. This Agreement shall be binding upon and inure to the benefit of the Employer and Employee and their respective heirs, legal representatives, successors, executors, administrators and assigns.

18.     SEVERABILITY. If any portion or portions of this Agreement shall be, for any reason, invalid or unenforceable, the remaining portion or portions shall nevertheless be valid, enforceable and carried into effect, unless to do so would clearly violate the present legal and valid intention of the parties hereto.

19.     AMENDMENTS. No amendments or variations of the terms and conditions of this Employment Agreement shall be valid unless the same is in writing and signed by Employer and Employee.

7

IN WITNESS WHEREOF, this Employment Agreement has been executed by Employer and Employee as of the date first above written.

EMPLOYER:

Quincy Physicians &
Surgeons Clinic, S.C.,
d/b/a Quincy Medical Group                    Attest:

By
Dan H. Evans, M.D.
Its Chairman


EMPLOYEE: _Linda Cooke MD_
Linda Cooke, M.D.

Date: 12 - 15 - 2010

This agreement will expire unless the above two signatures are executed by ~~December 10, 2010~~ DECEMBER 20, 2010

SEE ATTACHED EMAIL DATED 13 DEC 2010 FROM CAROL LEWIS RE: ADDITIONAL ITEMS TO BE CONSIDERED.
DMC

8

Electronically Filed - Marion Hannibal - August 27, 2018 - 11:59 AM

From:     "Lewis, Carol" <CLewis@quincymedgroup.com>
Subject:  FW: Dr. Cooke
Date:     Mon, December 13, 2010 8:28 pm
To:       lindamariemd@gmail.com,danielecooke@gmail.com,delmcooke@rallstech.com

---

Linda and Dan, please see attached a very comprehensive explanation of the compensation plan for physicians. I think this will address the first item on your list of when does the extra pay kick in and under what circumstances, including how ancillaries are handled.

Other items we talked about, since Friday, so that they are in one email:

- Lease - attached. As we discussed, you have first right of refusal if Patty and Luke sell, and I have asked the attorney to make that revision. Conversely, I will ask Patty and Luke if they want the same if you sell (knowing that is highly unlikely). QMG is only interested in ensuring that we receive "second" right of refusal before either party would sell to an outside party. The other item in the lease that I couldn't remember the other day is that it terminates if/when Dr. Cooke leaves QMG.
- Discounts and/or free products/services may be given to anyone that Dr. Cooke (or the NP's) deem appropriate, for fee-for-service services. This is what we do now in Plastics/Med Spa, and the same is true of your practice. Insurance services are of course different and cannot be discounted as a rule.
- Vacation/CMEs - there is no policy currently in place regarding physicians taking vacations and/or CMEs. They are not required to seek permission from anyone. As Aric has said, once your base is met, your production, days out, and CMEs is up to you and the impact it may or may not have on your compensation.
- When the NPs join, the addition of their nurse(s) will be your joint decisions. We have some physicians who want full control, some who only want a few screened applicants from which to choose, and others who want a qualified person to be chosen for them. This is yours to decide, and HR will support and coordinate whatever efforts you need.
- In general, staff for physicians are not hired without physician input, and the typical process when a doc wants to add someone is for the request to be made, we post a job desc for internal applications, run outside ads, and go from there based upon physician involvement. Conversely, when/if anyone needs to be fired, we follow a general protocol to make sure the physician is aware, involved, protected, or driving the process if its at his/her request. HR can often be a defender, driver, supporter, or instigator if the physician wants to be isolated. Again, its up to your comfort level, but everyone on our end understands how very important staff satisfaction is to you. I would say the same is true for most of our docs. Annual eval performances are given with physician involvement on scores and outcomes as well.
- 401K match - yes signing by the end of this year ensures a match for 2011, after the one-year employment.
- Dan passed me the staff names, salaries, and status today so I am running a quick check against our pay ranges to identify any outliers and we'll get those addressed soon. Only one that jumps out at me is the coder/biller, so I'll keep you posted what that looks like. More on staff and pay in coming day.

Let me know what else we need to wrap up.
Thanks,
Carol

-----Original Message-----
From: Williamson, Patty
Sent: Monday, December 13, 2010 3:26 PM
To: Lewis, Carol
Subject: RE: Dr. Cooke

Let me know if you need anything else. Patty

<<Phys compensation Plan - QMG DRAFT (8-16-08).DOC>>

Thanks,

Patty



# IN THE 10TH JUDICIAL CIRCUIT, MARION COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>RACHEL BRINGER SHEPHERD | Case Number: 18MR-CV01135 |
| Plaintiff/Petitioner:<br>LINDA COOKE MD and LINDAN LLC | Plaintiff's/Petitioner's Attorney/Address<br>JAMES F LEMON<br>LEMON LAW FIRM, LLC<br>119 SOUTH 10TH ST<br>HANNIBAL, MO 63401 |
| vs. | |
| Defendant/Respondent:<br>QUINCY PHYSICIANS & SURGEONS CLINIC | Court Address:<br>906 BROADWAY<br>HANNIBAL, MO 63401 |
| Nature of Suit:<br>CC Declaratory Judgment | |
| | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: QUINCY PHYSICIANS & SURGEONS CLINIC
Alias:

**C/O CT CORPORATION
120 S CENTRAL AVE
CLAYTON, MO 63105**



**COURT SEAL OF**

**MARION COUNTY**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

| September 7, 2018 | /s/ Carolyn J. Conners |
|---|---|
| Date | Clerk |

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).

☐ other: _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

| _____ | _____ |
|---|---|
| Printed Name of Sheriff or Server | Signature of Sheriff or Server |

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____

| _____ | _____ |
|---|---|
| Date | Notary Public |

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

IN THE CIRCUIT COURT OF MARION COUNTY,
DIVISION 2 AT HANNIBAL, MISSOURI
ASSOCIATE CIRCUIT DIVISION

| | | |
|---|---|---|
| LINDA COOKE, M.D. | ) | |
| & LINDAN, LLC | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| vs. | ) | CASE NO.: 18MR-CV01135 |
| | ) | |
| Quincy Physicians & Surgeons Clinic, S.C. | ) | |
| D/B/A QUINCY MEDICAL GROUP | ) | |
| | ) | |
| DEFENDANTS | ) | |

## PETITION

**Comes now** Plaintiffs, individually and by and through counsel, The Lemon Law Firm,

James Lemon and being duly sworn upon her oath, states as follows:

1. Plaintiff requests a jury trial as to all counts triable to a jury.

## COUNT I
## DECLARATORY JUDGMENT

2. Plaintiff Linda Cooke, is resident of Marion County, Missouri.

3. Plaintiff Lindan, LLC is a Missouri Limited Liability Company.

4. That Linda Cooke is one of the principals of and a member of Lindan, LLC.

5. Defendant is an Illinois Corporation doing business in the State of Missouri.

6. That in 2010, Defendant approached Plaintiff Linda Cooke and requested that she transfer

   her practice from an individual practice to a practice wherein she would remain in place

in the same office building operating with the same name and identity, but as an employee of Defendant.

7. That Defendant's stated goal was to obtain the benefits of the labor of Plaintiff Linda Cooke.

8. That at the time of the negotiations, Plaintiff Linda Cooke was leasing her office space from Lindan, LLC.

9. That as a further part of their offer, that Defendant offered to enter into a lease agreement with Lindan, LLC which would replace the existing lease.

10. That the parties engaged in various negotiations in which Defendant made multiple promises to Plaintiff Linda Cooke in her capacity as a physician and prospective employee, but also as a principal of Lindan, LLC.

11. That such promises were both oral, as well as written in emails from Defendant.

12. That one such promise made to Plaintiffs was that the lease agreement would contain a provision that the lease would terminate "if/when Dr. Cooke leaves QMG".

13. That such promise was made by Carol Brockmiller, f/k/a Carol Lewis in an email December 13, 2010, a copy of which is attached hereto as exhibit "A".

14. That such promise was made as an inducement to get Plaintiffs to sign the relevant documents.

15. That based upon such inducements, Plaintiffs signed the relevant documents, a lease agreement and an employment agreement, attached hereto as Exhibit's "B" and "C" respectively.

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

16. That when Plaintiff Linda Cooke signed the employment agreement, she specified that it was signed subject to the assurances made by Carol Lewis in said email, and that a copy was attached thereto.

17. That Defendants accepted such amendment as it was in writing, attached to the contract document, did not refuse the document, and have stated that it is their position that the contract is in effect and binding upon the parties.

18. That such provision was therefore a condition precedent for the contract.

19. That such provision was a material provision to the employment agreement.

20. That when the final lease was drafted by Defendants several months later, in fact Defendant did not include such provision in the lease agreement.

21. That the purported employment agreement is void for failure of a condition precedent.

22. That further, all such affirmations constituted a representation.

23. That as such a provision was not included in the final lease that such representations were therefore in fact false.

24. That Plaintiffs did not know that such affirmations were false, in fact believing the provision was in the lease.

25. That Defendant either knew such affirmations were false, or did not know if they were true or false when they made them.

26. That but for such affirmations, Plaintiff Linda Cooke would not have accepted employment with Defendant and such affirmations were therefore material.

27. That but for such affirmations that the provision was in the Lease, Plaintiff Lindan, LLC

would not have entered into the lease agreement.

28. That Defendants intended that the representation be acted on by Plaintiffs and that they would execute the agreements.

29. That Plaintiffs relied on the representations, and signed the agreements.

30. That as the representations were a part of the negotiation between the parties, Plaintiffs had a right to rely on the representations.

31. That Plaintiffs have been injured by the false allegations, in that Defendants have stated unequivocally that they intend to continue to occupy the building, and do not intend to surrender possession as they promised to do.

32. That the employment agreement and the lease agreement are therefore void for fraud in the inducement.

33. That as a result of the foregoing, that there exists an actual case or controversy of judicable nature between Plaintiffs and Defendant concerning the rights and obligations of each party under the alleged employment agreement and the alleged lease.

WHEREFORE, pursuant to Rule 87 of the Missouri Rules of Civil Procedure and Section 527.010 RSMo Plaintiffs prays the Court to enter a judgment in favor of Plaintiffs declaring that the Employment agreement is void, and that the Lease Agreement is void, without further force and effect, and that the costs of this action be taxed to Defendant.

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

## COUNT II
## FRAUD

34.    Plaintiff Linda Cooke restates and realleges paragraphs 1-33 as if restated fully herein.

35.    That all affirmations previously described constituted representations.

36.    That as such a termination provision was not included in the final lease, that such representations were therefore in fact false.

37.    That Plaintiff Linda Cooke did not know that such affirmations were false, in fact believing the termination provision was in the lease.

38.    That Defendant either knew such affirmations were false, or did not know if they were true or false when they made them.

39.    That but for such affirmations, Plaintiff Linda Cooke would not have accepted employment with Defendant and such affirmations were therefore material.

40.    That Defendants intended that the representation be acted on by Plaintiff Linda Cooke and that she would proceed with employment with them.

41.    That Plaintiff Linda Cooke relied on the representations of Defendant, and signed the employment agreement.

42.    That as the representations were a part of the negotiation between the parties, Plaintiff Linda Cooke had a right to rely on the representations.

43.    That Plaintiff Linda Cooke has been injured by the false allegations, in that Defendants have unequivocally refused to leave her building unless she sign various documents, and make various concessions which they are not entitled to demand her to sign or to make.

44.    That Plaintiff Linda Cooke has been further injured by the false allegations in that she will be forced to rent other space in order to continue practicing medicine, and will incur

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

substantial monetary damages thereby.

45. That Defendants acted with evil motive or intent by their false representations to Plaintiff Linda Cooke.

46. That alternatively, Defendants acted with reckless or callous indifference to the rights of Plaintiff Linda Cooke by their false representations to Plaintiff Linda Cooke.

47. That such evil motive or intent or callous our reckless indifference to the rights of Plaintiff Linda Cooke is shown by Defendants conduct in showing up unannounced at her office purporting to terminate Plaintiff Linda Cooke, claiming they intended to move all equipment, threatening employees and making other outrageous statements.

48. That such evil motive or intent or callous our reckless indifference to the rights of Plaintiff Linda Cooke is further shown by statements made by Defendants Lawyer when they showed up at her office that "You don't have any rights to be here because we changed that part of the lease agreement", delivered in a condescending tone and manner.

**WHEREFORE**, Plaintiff Linda Cooke prays that the court find that Defendants affirmations were fraudulent, that the court grant Plaintiff Linda Cooke her damages arising from said fraud, that the court award Plaintiff Linda Cooke punitive damages against Defendant, that the court award Plaintiff Linda Cooke reasonable attorney's fees, and that interest accrue on all unpaid amounts at the statutory rate.

## <u>COUNT III</u>
## <u>FRAUD</u>

49.    Plaintiff Linda Cooke restates and realleges paragraphs 1-48 as if restated fully herein.

50.    That but for Defendant's Fraudulent Affirmations, that Plaintiff Linda Cooke would not

have worked for Defendant either under an employment agreement or otherwise.

51.    That Defendants did not bill certain patients properly on behalf of Plaintiff Linda Cooke.

52.    That Plaintiff Linda Cooke began to suspect that such billing was being done improperly

and demanded that Defendant check their calculations more closely.

53.    That Defendants claimed to have further checked and made affirmations to Plaintiff that

the calculations were correct.

54.    That in fact Defendants did not check their calculations more closely and continued to bill

in error, constituting a further representation, which was false.

55.    That Plaintiff Linda Cooke believed all such affirmations and relied upon them.

56.    That as Defendants were in a position of employer to Plantiff Linda Cooke, she was

entitled to rely upon all such representations.

57.    That Plaintiff Linda Cooke did not know that such affirmations were false.

58.    That Defendant either knew all such affirmations were false, or did not know if they were

true or false when they made them.

59.    That but for such affirmations, Plaintiff Linda Cooke would not have accepted

employment with Defendant and further would not have continued in her employment

with them so such affirmations were therefore material.

60.    That Defendants intended that the representatios be acted on by Plaintiff Linda Cooke

continue providing them the benefits of her labor.

61. That the amount of difference between the correct calculations and the incorrect calculations was as much as $800,000 per year.

62. That but for Defendant's fraud, Plaintiff would have been billing her patients herself and would have billed them properly.

63. That therefore, as a direct result of Defendant's fraud, Plaintiff was damaged in the amount of incorrect billing.

64. That Defendant for a period of 4 years paid Plaintiff Linda Cooke on incorrect calculations, continuing to assure Plaintiff Linda Cooke that such calculations were correct.

65. That based upon such assurances, Plaintiff Linda Cooke continued working for Defendant and accepting the incorrect amount of compensation.

66. That as a result of the foregoing, Plaintiff Linda Cooke was damaged in an amount greater than $850,000.00 for a period of 4 years, or an amount in excess of $3,400,000.00.

## COUNT IV
## FRAUD

67.   Plaintiff Linda Cooke restates and realleges paragraphs 1-66 as if restated fully herein.

68.   That during Defendant's attempts to induce Plaintiff Linda Cooke to work for them, they made multiple promises.

69.   That one of the promises was that if she would consent to work for them that so long as she went back to private practice and did not join another organization that they would allow her to do so willingly on their part.

70.   That further Defendants promised that they would not interfere with her leaving.

71.   That such promises were verbal, but also were included in the terms of the purported employment agreement.

72.   That all such promises constitute an affirmation.

73.   That Defendants did not intend to honor such promises and they were therefore false affirmations

74.   That Plaintiff Linda Cooke did not know that such affirmations were false, in fact believing Defendants intended to honor their agreement.

75.   That Defendant either knew such affirmations were false, or did not know if they were true or false when they made them.

76.   That but for such affirmations, Plaintiff Linda Cooke would not have accepted employment with Defendant and such affirmations were therefore material.

77.   That Defendants intended that the representation be acted on by Plaintiff Linda Cooke and that she would proceed with employment with them.

78. That Plaintiff Linda Cooke relied on the representations, and signed the agreement.

79. That as the representations were a part of the negotiation between the parties, Plaintiff Linda Cooke had a right to rely on the representations.

80. That Plaintiff Linda Cooke has been injured by the false allegations, in that Defendants unequivocally refused to leave her building unless she sign various documents, which they were not entitled to demand.

81. That Plaintiff Linda Cooke has been further injured by the false allegations as she was forced to retain legal counsel to force Defendants to leave her premises.

82. That Plaintiff Linda Cooke has been further injured by the false allegations as Defendants actions are interfering with her ability to notify patients and are damaging her Doctor/Patient relationship with them.

83. That Defendants acted with evil motive or intent by their false representations to Plaintiff Linda Cooke.

84. That alternatively, Defendants acted with reckless or callous indifference to the rights of Plaintiff Linda Cooke by their false representations to Plaintiff Linda Cooke.

85. That such evil motive or intent or callous our reckless indifference to the rights of Plaintiff Linda Cooke is shown by Defendants conduct in showing up unannounced at her office purporting to terminate Plaintiff Linda Cooke, claiming they intended to move all equipment, threatening employees and making other outrageous statements.

86. That such evil motive or intent or callous our reckless indifference to the rights of Plaintiff Linda Cooke is further shown by statements made by Defendants Lawyer when they showed up at her office that "You don't have any rights to be here because we

changed that part of the lease agreement", delivered in a condescending tone and manner.

87.    That such evil motive or intent or callous our reckless indifference to the rights of Plaintiff Linda Cooke is further shown by their refusals to honor their promises unless Plaintiff Linda Cooke grant various concession to which they are not entitled.

**WHEREFORE,** Plaintiff Linda Cooke prays that the court find that Defendants affirmations were fraudulent, that the court grant Plaintiff Linda Cooke her damages arising from said fraud, that the court award Plaintiff Linda Cooke punitive damages against Defendant, that the court award Plaintiff Linda Cooke reasonable attorney's fees, and that interest accrue on all unpaid amounts at the statutory rate.

## COUNT V,
## CONVERSION

88.    Plaintiff Linda Cooke restates and realleges paragraphs 1-89 as if restated fully herein.

89.    That prior to being induced by Defendant's false affirmations, Plaintiff Linda Cooke was engaged in a solo practice.

90.    That as part of that solo practice, Plaintiff Linda Cooke had a particular telephone number and website address.

91.    That such telephone number and website address were advertised by her were known to her patients, and the community in general.

92.    That Plaintiff Linda Cooke expended substantial sums in advertising, and making the phone number and website generally know.

93.    That the purported employment agreement between Plaintiff Linda Cooke and Defendant is void and without cause or effect.

94.    That Defendants therefore have no right to ownership of said phone number and website.

95.    That further however, the said purported employment agreement makes no provision for transfer of ownership of the phone number and website.

96.    That further there is no other written agreement wherein such agreement was made.

97.    That any such agreement if it existed would be banned therefore by the statute of frauds.

98.    That further however, there was no verbal agreement between the parties regarding the phone number and website.

99.    That despite all of the foregoing, Defendants have refused to turn over Plaintiff's phone number and have withheld it from her.

100. That in fact the Defendants have place their own website on the address owned by Plaintiff Linda cooke.

101. That all such actions are taken with full knowledge that they have no ownership interest in the said property.

102. That the value of said property is in excess of $400,000.00

103. WHEREFORE, Plaintiff Linda Cooke respectfully pray for judgment against Plaintiff in the amount of her damages, that the court further award punitive damages in an amount reasonably calculated to prevent such further behavior, and any other appropriate relief necessary to make Plaintiff Linda Cooke whole, and such other legal and equitable relief as this Court deems just and proper.

## COUNT VI
## DETRIMENTAL RELIANCE/PROMISSORY ESTOPPEL

104. Plaintiff Linda Cooke restates and realleges paragraphs 1-103 as if restated fully herein.

105. That in the process of their attempts to induce Plaintiff Linda Cooke to work for them and share the benefits of her labor, Defendant promised to do all of Plaintiff Linda Cooke's billing for her.

106. That Defendant promised to bill Plaintiff Linda Cooke's patients, insurance providers, and government benefit programs properly for the amounts agreed to by such payors.

107. That based upon Defendant's promises, Plaintiff Linda Cooke shared the benefits of her labor with Defendants.

108. That Plaintiff Linda Cooke relied on such promises.

109. That such reliance was reasonable as Defendants held themselves out as skilled in the process of billing.

110. That Defendant failed in their promise and billed various clients and payors in error.

111. That such billing errors resulted in Plaintiff Linda Cooke being paid substantially less than she would have been paid if the billing had been done properly, and she therefore relied to her detriment.

112. That further, Plaintiff Linda Cooke began to suspect that such billing was being done improperly and demanded that Defendant check their calculations more closely.

113. That Defendants claimed to have further checked and made additional promises to Plaintiff Linda Cooke that the calculations were correct.

114. That Plaintiff Linda Cooke further believed such promises and relied upon them.

115. That it was reasonable for Plaintiff Linda Cooke to rely upon Defendant's assurances.

116. That it was reasonably foreseeable that Plaintiff Linda Cooke would continue to work for Defendants and further that she would be damaged if the billing calculations were made in error.

117. That in fact Defendant did not check their calculations and in fact continued to calculate in error.

118. That the amount of difference between the correct calculation and the incorrect calculation was as much as $800,000 per year.

119. That Plaintiff Linda Cooke has been damaged as a direct and proximate cause of Defendant's failure to live up to their promises.

120. That Defendant for a period of 5 years paid Plaintiff Linda Cooke on incorrect calculations, continuing to assure Plaintiff Linda Cooke that such calculations were correct.

121. That based upon such further, Plaintiff Linda Cooke continued working for Defendant and accepting the incorrect amount of compensation.

122. That as a result of the foregoing, Plaintiff Linda Cooke was damaged in an amount greater than $800,000.00 for a period of 5 years, or an amount in excess of $4,000,000.00.

123. That despite being made aware of such billing errors, which they have insisted upon passing on to Plaintiff Linda Cooke, resulting in them failing to pay her the compensation she was promised.

124. That injustice can only be avoided by enforcement of the promise.

125. That Plaintiff Linda Cooke is entitled to judgment against Defendant in the amount of the

difference between what she was owed and what Defendant actually billed.

WHEREFORE, for the reasons above stated, Plaintiff Linda Cooke requests that the court find that Plaintiff was unjustly enriched by the difference in the value of her labor as promised by Defendant, less the amount actually paid to her for such labor by Defendant, and for such other and further relief as the court may deem meet and just.

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

## COUNT VII
## UNJUST ENRICHMENT

126. Plaintiff Linda Cooke restates and realleges paragraphs 1-125 as if restated fully herein.

127. That as part of their relationship, Defendant has made it their custom and practice to purchase supplies for Plaintiff Linda Cooke to use during the operation of her business.

128. That it has further been Defendant's practice that they keep a "dashboard", wherein they keep track of such supplies as they are provided and deduct that amount from the total amount of compensation paid to Plaintiff Linda Cooke.

129. That such deductions is made as soon as the supplies are provided.

130. That there are currently various supplies at the office building owned by Lindan, LLC.

131. That the cost or value of such supplies has already been deducted from Plaintiff Linda Cooke's dashboard.

132. That as a result, Plaintiff Linda Cooke has already paid for all supplies currently in her possession.

133. That notwithstanding such fact, Defendant has demanded that Plaintiff Linda Cooke purchase all such supplies from Defendant, or has stated in the alternative that it is their intent to withhold such supplies from Plaintiff Linda Cooke.

134. That Defendant by their demands is attempting to force Plaintiff Linda Cooke to pay for the supplies twice.

135. That such requirement would constitute unjust enrichment to Defendant.

136. That further, Plaintiff Linda Cooke had received various supplies from pharmaceutical companies as samples.

137. That such samples were not property which were given to Defendant, but were rather

provided to Plaintiff Linda Cooke, for her use as a practicing physician.

138. That such samples are composed primarily of items which are prescription medication.

139. That Plaintiff Linda Cooke signed agreements with the pharmaceutical companies agreeing to be responsible for such prescribed items.

140. That when Defendant vacated the premises owned by Plaintiff Lindan, they improperly removed all of the said prescription medication.

141. That despite demands by Plaintiff Linda Cooke, Defendants refused to return such prescription medication.

142. That the medication in question is valued in an amount in excess of $30,000.00

143. That Defendant's actions in removing prescription medication which Plaintiff Linda Cooke was personally responsible for without her permission or without the permission of the pharmaceutical companies were in violation of state and federal law.

144. That because of Defendants improper and illegal seizure of prescription medication, Plaintiff Linda Cooke is unable to provide it to her patients.

145. That further Defendants actions in seizing such medication constituted unjust enrichment to Defendants.

WHEREFORE, Plaintiff Linda Cooke requests the court to find that Defendant has been unjustly enriched, that the court grant Plaintiff Linda Cooke judgment against Defendant in the amount previously paid for such supplies, and for such other and further relief as the court may deem meet and just.

_Linda Cooke MD_

Linda Cooke, M.D., Plaintiff

State of Missouri )
                 ) ss.
County of Marion )

Subscribed and sworn to before me, a Notary Public, this 25th day of Sept. , 2018

AMBER LEEANN PHILLIPS
Notary Public - Notary Seal
STATE OF MISSOURI
Marion County
My Commission Expires: May 4, 2021
17942114

Notary Public

Linda Cooke, as Member for Plaintiff LINDAN, LLC, being duly sworn, deposes and states to the best of their knowledge, information, and belief, the facts set forth in the foregoing affidavit and petition are true.

LINDAN, LLC

Linda Cooke, M.D., Plaintiff & Member

State of Missouri )
                 ) ss.
County of Marion )

Subscribed and sworn to before me, a Notary Public, this 25th day of Sept. , 2018

AMBER LEEANN PHILLIPS
Notary Public - Notary Seal
STATE OF MISSOURI
Marion County
My Commission Expires: May 4, 2021
17942114

Notary Public

Respectfully Submitted By:

James F. Lemon, Bar # 40480
Attorney for Plaintiffs
Lemon Law Firm, LLC
119 S. 10th Street
Hannibal, Missouri 63401
Phone: (573) 221-1800
Fax:: (573) 221-6990
james@thelemonlawfirm.net

Page 19 of 19

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

From:     "Lewis, Carol" <CLewis@quincymedgroup.com>
Subject:  FW: Dr. Cooke
Date:     Mon, December 13, 2010 8:28 pm
To:       tindamariemd@gmail.com,danielecooke@gmail.com,delmcooke@rallstech.com

---

Linda and Dan, please see attached a very comprehensive explanation of the compensation plan for physicians. I think this will address the first item on your list of when does the extra pay kick in and under what circumstances, including how ancillaries are handled.

Other items we talked about, since Friday, so that they are in one email:

- Lease - attached. As we discussed, you have first right of refusal if Patty and Luke sell, and I have asked the attorney to make that revision. Conversely, I will ask Patty and Luke if they want the same if you sell (knowing that is highly unlikely). QMG is only interested in ensuring that we receive "second" right of refusal before either party would sell to an outside party. The other item in the lease that I couldn't remember the other day is that it terminates if/when Dr. Cooke leaves QMG.
- Discounts and/or free products/services may be given to anyone that Dr. Cooke (or the NP's) deem appropriate, for fee-for-service services. This is what we do now in Plastics/Med Spa, and the same is true of your practice. Insurance services are of course different and cannot be discounted as a rule.
- Vacation/CMEs - there is no policy currently in place regarding physicians taking vacations and/or CMEs. They are not required to seek permission from anyone. As Aric has said, once your base is met, your production, days out, and CMEs is up to you and the impact it may or may not have on your compensation.
- When the NPs join, the addition of their nurse(s) will be your joint decisions. We have some physicians who want full control, some who only want a few screened applicants from which to choose, and others who want a qualified person to be chosen for them. This is yours to decide, and HR will support and coordinate whatever efforts you need.
- In general, staff for physicians are not hired without physician input, and the typical process when a doc wants to add someone is for the request to be made, we post a job desc for internal applications, run outside ads, and go from there based upon physician involvement. Conversely, when/if anyone needs to be fired, we follow a general protocol to make sure the physician is aware, involved, protected, or driving the process if its at his/her request. HR can often be a defender, driver, supporter, or instigator if the physician wants to be isolated. Again, its up to your comfort level, but everyone on our end understands how very important staff satisfaction is to you. I would say the same is true for most of our docs. Annual eval performances are given with physician involvement on scores and outcomes as well.
- 401K match - yes signing by the end of this year ensures a match for 2011, after the one-year employment.
- Dan passed me the staff names, salaries, and status today so I am running a quick check against our pay ranges to identify any outliers and we'll get those addressed soon. Only one that jumps out at me is the coder/biller, so I'll keep you posted what that looks like. More on staff and pay in coming day.

Let me know what else we need to wrap up.
Thanks,
Carol

-----Original Message-----
From:  Williamson, Patty
Sent:  Monday, December 13, 2010 3:26 PM
To:    Lewis, Carol
Subject:  RE: Dr. Cooke

Let me know if you need anything else. Patty

<<Phys compensation Plan - QMG DRAFT (8-16-06).DOC>>

Thanks,

Patty

$Exhibit "B"$

## LEASE AGREEMENT

This Lease Agreement is hereby made and entered into effective as of June 1, 2011, by and between Lindan, L.L.C., a Missouri Limited Liability Company, (hereinafter called the "Lessor"), and Quincy Physicians & Surgeons Clinic, S.C., doing business as Quincy Medical Group, an Illinois Medical Corporation, (hereinafter called the "Lessee") upon the following terms and conditions:

1.     PREMISES. For and in consideration of the rent to be paid and the covenants to be performed by Lessee hereunder, Lessor hereby leases to lessee, and Lessee leases and accepts, subject to the terms and conditions of this Lease, the premises referred to as the Leased Premises, being an improved professional office space measuring a total of approximately 12,408 square feet in size on two floors, as outlined on the attached site plan marked Exhibit A, commonly known as 163 Medical Drive, Hannibal, Missouri 63401, and being a part of the building and other improvements owned by Lessor located on the real estate described in Exhibit B, each of said Exhibits being attached hereto and incorporated herein by reference, and hereinafter sometimes called the "Premises" and sometimes the "Leased Premises".

2.     LEASE TERM. The Lease Term shall be for a period of five (5) years from June 1, 2011 (the "Commencement Date") through May 31, 2016 (the "Initial Term").

3.     RENT AND LATE PAYMENT PENALTY. Lessee shall pay Lessor a monthly rent during the Initial Term of:
               (a)     $12,925 per month from June 1, 2011 through August 31, 2011; and
               (b)     $15,510 per month from September 1, 2011 through May 31, 2016, which rent shall not be decreased but will be subject to increases as provided hereafter.

For each year of the Initial Term or Extended Term (as defined in Section 4) after the first year of the Initial Term, commencing with the year beginning June 1, 2012 and ending May 31, 2013, the amount of rent payable will be increased and such increases will be determined by reference to the percentage changes in the Consumer Price Index published by the United States Government for the All Urban Consumers for Midwest Region, All Items, 1982-84= 100 (the "CPI"). If the standard reference base of 1982-84= 100 is changed, the percentage changes in the CPI shall be calculated thereafter by using officially re-based data. The rental for years subsequent to the first year of the Lease shall be increased each year in June by a percentage equal to the percentage increase in the CPI from June of the previous year to and including May of the year in which the increase in rent takes effect. The CPI for the reference month from which any increase is measured shall be referred to as the First CPI and the CPI for the reference month to (and including) which any price increase is measured shall be referred to as the Second CPI. The percentage increase in the CPI shall be determined as follows:
               (i)     the First CPI shall be subtracted from the Second CPI;
               (ii)     the result obtained from (i) shall be divided by the First CPI; and
               (iii)     the result obtained from (ii) shall be multiplied by 100.

1

All rent provided herein shall be due and payable on the first day of each month during the term of this Agreement. Unless and until Lessee is otherwise notified in writing by Lessor, Lessee shall pay all rent and other amounts payable to lessor under this Agreement by check or draft made payable to Lessor and mailed by Lessee to Lessor's address shown on the signature page hereof.

In addition to the rent hereinabove provided, Lessee shall pay a late payment penalty of ten (10) percent of the amount of any monthly rental payment, or payment of any other obligation of the Lessee provided herein, not paid on or before the fifth day of each month, which late payment penalty shall become immediately due and payable, and failure to pay the same upon demand shall place the Lessee in default of this Agreement.

4.    OPTION TO EXTEND.  Lessee shall have the option to extend the term of this Lease for five additional terms of one year each (each, the "Extended Term"), beginning at the end of the Initial Term and continuing at the end of each of the first four Extended Terms, upon all of the terms and conditions hereof, by giving written notice of its intention to so extend at least sixty (60) days prior to the expiration of the Initial Term or Extended Term, as the case may be.

The rent during each Extended Term shall be determined in accordance with Section 3 hereof.

5.    USE AND TITLE.

(a)    The Leased Premises shall be used and occupied by Lessee solely as a professional medical office, and for no other purpose, without the Lessor's prior written consent, which shall not be unreasonably withheld.  Lessee shall promptly comply with all valid regulations, orders, ordinances, and laws of legally-constituted authorities applicable to the use and occupancy of the Leased Premises.  Lessor warrants and represents to Lessee that Lessor has full right and lawful authority to enter into this Lease and that Lessor has good and marketable title to the Leased Premises.  Lessee shall have and hold quiet and peaceable use and possession of the Leased Premises during the entire lease term; and Lessor warrants and agrees to defend such use and possession of the Lessee against the claims of any and all persons whomsoever.

(b)    In addition to the Leased Premises, Lessee shall have the exclusive use of the Parking Area, as shown on Exhibit A, including parking areas, service roads, and other areas constructed for use by Lessee, its employees and business invitees, subject, however, to the terms of this Agreement and reasonable rules and regulations prescribed from time to time by Lessor.

6.    TAXES.  Lessee agrees to pay directly to the Marion County Treasurer or other tax collector for Marion County all real estate and ad valorem taxes, including any and all general or special assessments, which may be levied or assessed by any lawful authority for each year during the Initial and any Extended Term, including those assessed against the land and/or

2

All rent provided herein shall be due and payable on the first day of each month during the term of this Agreement. Unless and until Lessee is otherwise notified in writing by Lessor, Lessee shall pay all rent and other amounts payable to lessor under this Agreement by check or draft made payable to Lessor and mailed by Lessee to Lessor's address shown on the signature page hereof.

In addition to the rent hereinabove provided, Lessee shall pay a late payment penalty of ten (10) percent of the amount of any monthly rental payment, or payment of any other obligation of the Lessee provided herein, not paid on or before the fifth day of each month, which late payment penalty shall become immediately due and payable, and failure to pay the same upon demand shall place the Lessee in default of this Agreement.

4.    OPTION TO EXTEND. Lessee shall have the option to extend the term of this Lease for five additional terms of one year each (each, the "Extended Term"), beginning at the end of the Initial Term and continuing at the end of each of the first four Extended Terms, upon all of the terms and conditions hereof, by giving written notice of its intention to so extend at least sixty (60) days prior to the expiration of the Initial Term or Extended Term, as the case may be.

The rent during each Extended Term shall be determined in accordance with Section 3 hereof.

5.    USE AND TITLE.

(a)    The Leased Premises shall be used and occupied by Lessee solely as a professional medical office, and for no other purpose, without the Lessor's prior written consent, which shall not be unreasonably withheld. Lessee shall promptly comply with all valid regulations, orders, ordinances, and laws of legally-constituted authorities applicable to the use and occupancy of the Leased Premises. Lessor warrants and represents to Lessee that Lessor has full right and lawful authority to enter into this Lease and that Lessor has good and marketable title to the Leased Premises. Lessee shall have and hold quiet and peaceable use and possession of the Leased Premises during the entire lease term; and Lessor warrants and agrees to defend such use and possession of the Lessee against the claims of any and all persons whomsoever.

(b)    In addition to the Leased Premises, Lessee shall have the exclusive use of the Parking Area, as shown on Exhibit A, including parking areas, service roads, and other areas constructed for use by Lessee, its employees and business invitees, subject, however, to the terms of this Agreement and reasonable rules and regulations prescribed from time to time by Lessor.

6.    TAXES. Lessee agrees to pay directly to the Marion County Treasurer or other tax collector for Marion County all real estate and ad valorem taxes, including any and all general or special assessments, which may be levied or assessed by any lawful authority for each year during the Initial and any Extended Term, including those assessed against the land and/or

2

building comprising the Premises. For the year 2011 and the final year of the Lease, the taxes shall be prorated between Lessor and Lessee based upon the number of months during such year Lessee leased the Premises. In the event any tax, except income taxes, shall be assessed upon rent by any governmental authority to the within premises, said tax shall be paid by Lessee as additional rental, in the same proportion as hereinbefore provided. In the event Lessee shall elect to contest the taxes, any expense incurred in such contest, including reasonable attorneys' fees or appraisers' fees shall be borne by Lessee.

In addition to its share of all taxes described in the preceding paragraph, Lessee agrees to pay all real estate and ad valorem taxes, including any and all general or special assessments, which may be levied or assessed by any lawful authority upon any leasehold improvements made by the Lessee during the term of this Lease.

7.    INSURANCE.

(a)    At all times during the Initial Term and any Extended Term, Lessee shall maintain in force and effect at its own cost and expense all fire and extended coverage insurance required to insure the fair market value of the building shown on Exhibit A, except that Lessor shall reimburse Lessee for one-sixth of the monthly premiums for the months of June through August, 2011.

(b)    At all times during the Initial Term and any Extended Term, Lessee shall maintain in force and effect, at its own cost and expense, a policy or policies of Public Liability Insurance for the protection, indemnification and defense of Lessee and Lessor (with Lessor named as an additional insured) against any and all claims and causes of action arising out of or in connection with the use, maintenance, operation and occupancy of the Premises, which policy or policies shall have limits of not less than $4,000,000.00 combined limits coverage per occurrence for bodily injury liability and property damage liability. At Lessor's request, Lessee shall name Lessor's mortgagee as an additional insured under any policy of liability insurance.

(c)    Lessee shall keep and maintain in force and during the Initial Term and any Extended Term, plate glass insurance upon windows and doors in the Leased Premises, delivering certificates of such insurance to Lessor.

8.    LESSEE'S DUTY OF REPAIR AND MAINTENANCE. Except as provided in paragraph 10 of this Lease as being required of the Lessor, Lessee shall:

(a)    keep and maintain in good order, condition and repair (including any such replacement and restoration as is required for that purpose) the Leased Premises and every part thereof and any and all appurtenances thereto wherever located, including, but without limitation, the exterior and interior portions of all doors, door checks, windows, plate glass, storefront, all plumbing and sewage facilities within the Leased Premises including free flow up to utility owned sewer line, fixtures, heating and air conditioning and electric systems (whether or not located in the leased premises), sprinkler system, walls, floors, and ceilings, meters applicable to

3

Lessee's premises, and all installations made by Lessee under the terms of this Lease and any exhibits thereto, as herein provided; any repairs required to be made in the Premises due to burglary of the premises or other illegal entry into the Premises or any damage to the Premises caused by a strike involving the Lessee or its employees. Any charges to furnish service to the Leased Premises made by any utility company or municipality shall be paid by Lessee within the time limit specified by each utility company. Lessee shall contract with a service company for reasonable maintenance of the heating, ventilation, and air conditioning equipment, with a copy of the service contract to be furnished to Lessor.

(b)     Lessee shall keep and maintain the Leased Premises in a clean, sanitary and safe condition and in accordance with all directions, rules and regulations of the proper officials of the governmental agencies having jurisdiction, at the sole cost and expense of Lessee, and Lessee shall comply with all requirements of law, by statute, ordinance or otherwise, affecting the Leased Premises and all appurtenances thereto. If Lessee refuses or neglects to commence and to complete repairs promptly and adequately, Lessor may, but shall not be required to, make and complete said repairs and Lessee shall pay the cost thereof to Lessor as an additional rent upon demand.

(c)     Lessee agrees to maintain at its cost and expense during the Initial Term and any Extended Term of this Lease the Parking Area. Such expenses shall include, without limitation, the operating, lighting, repairing, replacing, and maintaining the Parking Area, specifically including landscaping, parking lot, line painting, lighting, traffic control, if any, sanitary control, removal of snow, trash, rubbish, garbage and other refuse, costs of all rentals of machinery equipment in such maintenance, and the cost of necessary personnel to implement such services.

(d)     Lessee hereby acknowledges that Lessor has caused to be installed smoke detectors as required by law in the leased Premises, and has instructed Lessee in the use, operation and maintenance of the same. Lessee hereby covenants and agrees to repair and maintain said smoke detectors in proper working condition during the term of this Lease, and specifically to test said smoke detectors not less frequently than monthly, to insure that the same are continually maintained in proper working order. If the Lessee shall at any time determine that any of said smoke detectors are not in proper working condition, the Lessee shall immediately cause the same to be repaired or replaced and notify Lessor by telephone, confirmed in writing, of such malfunction, and of the corrective action taken to cause said smoke detectors to be in proper working order.

9.     SURRENDER OF PREMISES.  At termination of this Lease, the Lessee hereby agrees to deliver the Leased Premises in the same condition as received by it on the Commencement Date (subject, to the removals hereinafter required) as the Leased Premises were on the date of this Lease, reasonable wear and tear excepted, and shall surrender all keys for the Leased Premises to Lessor at the place then fixed for the payment of rent and shall inform Lessor of all combinations of locks, safes and vaults, if any, in the Leased Premises. Lessee during the last thirty (30) days of such term shall remove all its trade fixtures, and, to the extent required by

4

Lessor by written notice, any other installations, alterations or improvements provided herein, before surrendering the Leased Premises as aforesaid and shall repair any damage to the Leased Premises caused thereby. Lessee's obligation to observe or perform this covenant shall survive the expiration or the termination of the Lease. Any items remaining in the Leased Premises on the Termination Date of this Lease shall be deemed abandoned for all purposes and shall become the property of Lessor and the latter may dispose of the same without liability of any type or nature.

10. **LESSOR'S DUTY TO REPAIR.** Lessor shall keep and maintain the foundation, exterior walls and roof of the building on the Premises exclusive of doors, door frames, door checks, windows, and exclusive of window frames located in exterior building walls, in good repair except that Lessor shall not be called upon to make any such repairs occasioned by the act or neglect of Lessee, its agents, employees, invitees, licensees or contractors. Lessor shall not be called upon to make any other improvements or repairs of any kind upon the Leased Premises and appurtenances. Any of the foregoing repairs required to be made by reason of the negligence of Lessee, its agents, employees, invitees, licensees, or contractors, as above described, shall be the responsibility of the Lessee notwithstanding the provisions above contained in this paragraph. "Exterior Walls", as used in this paragraph shall not be deemed to include the building front, plate glass, window cases or window frames, doors or frames, security grills or similar enclosures.

11. **COVENANT AGAINST LIENS.** If, because of any act or omission of Lessee, any mechanic's lien or other lien, charge or order for the payment of money shall be filed against Lessor or against the Premises or any improvement, Lessee shall, at its own cost and expense, cause the same to be discharged of record or bonded in a manner sufficient to allow a title insurer to insure against said claim within thirty (30) days after written notice from Lessor to Lessee of the filing thereof. Failure to do so shall constitute an event of default under this Lease except that if Lessee is contesting any such lien in a manner which is reasonable and such contest forestalls foreclosure or enforcement of said lien, then such lien shall not constitute a default under this Lease. Lessee shall indemnify and save harmless Lessor from any and all such liens, and expenses, costs, damages or fees (including reasonable attorneys' fees and expenses) arising from a failure to comply with the requirements of this Section.

12. **EMERGENCY LIGHTING.** In the event that any governmental regulations from time to time shall require emergency lighting to be installed in the Leased Premises, the installation and maintenance of the same, including providing a battery power, shall be the responsibility of Lessee.

13. **FIXTURES AND IMPROVEMENTS.** Lessee may, after first obtaining Lessor's written approval and consent, at its own cost and expense, install equipment, furniture, and fixtures on the Leased Premises and make any alterations, additions, or improvements in and to the Leased Premises, providing such work is done in a proper manner and without impairing the structural integrity of the improvements then located on the Premises. All such equipment, furniture and fixtures shall remain the property of Lessee and shall be removed by Lessee, at its

own cost and expense, during the last thirty (30) days of the term of this Lease; and if any damage to improvements results from such removal, Lessee shall repair such damage immediately at its own cost and expense.

14. **SUBORDINATION.** Upon request of Lessor, Lessee agrees to execute and deliver a written agreement subordinating this Lease and Lessee's rights under this Lease to any real estate mortgage hereafter placed upon the land and buildings comprising the Premises; provided, however, that such subordination shall be granted upon the express conditions that, so long as Lessee shall not be in default hereunder, this Lease shall be recognized by the holder of any such mortgage, and that the rights of the Lessee hereunder shall remain in full force and effect according to the provisions of this Agreement, notwithstanding any default upon or foreclosure under any such mortgage.

15. **LIABILITY OF LESSEE AND INDEMNIFICATION.**

(a) <u>Indemnification of Lessor.</u> Lessee shall protect, indemnify and save Lessor harmless from and against any and all liability and expenses of any kind arising from injuries or damages to persons or property on the Leased Premises, arising out of or resulting in any way from any act or omission of the Lessee, its agents, servants and employees, in connection with the use of the real estate described in Exhibit B and any of the improvements contained thereon, including, without limitation, that portion referred to as "Premises" and Parking Area contiguous thereto.

(b) <u>Notice of Claim or Suit.</u> Lessee agrees to promptly notify Lessor of any claim, action, proceeding or suit instituted or threatened against the Lessor. In the event Lessor is made a party to any action for damages which Lessee has herewith indemnified Lessor against, the Lessee shall pay all costs and shall provide effective counsel in such litigation or shall pay, at Lessor's option, the attorney fees and costs incurred in connection with said litigation by Lessor.

(c) <u>Property of Lessee.</u> Lessee agrees that all property owned by it in, on or about the premises shall be the sole risk and hazard of the Lessee. Lessor shall not be liable or responsible for any loss or damage to Lessee, or any one claiming under or through Lessee, or otherwise, whether caused by or resulting from a peril required to be insured hereunder, or from water, steam, gas, leakage, plumbing, electricity or electrical apparatus, pipe or apparatus of any kind, the elements or other similar or dissimilar causes, and whether or not originating in the demised premises or elsewhere, irrespective of whether or not Lessor may be deemed to have been negligent with respect thereto, unless Lessor shall be deemed to have been grossly negligent with respect thereto, or such damage or loss is the result of an intentional and willful wrongful act of Lessor.

16. **CASUALTY LOSSES.**

(a) <u>Repairs After Casualty.</u> In the event of damage to the building or other improvements on the Premises resulting from fire or other casualty, Lessee shall give written

6

notice thereof to Lessor within ten (10) days after the casualty damage. Lessor shall have the option of repairing such damage. If Lessor elects to repair such damage, the work shall be performed promptly and diligently; and if requested to do so by Lessor, Lessee shall act as agent of Lessor for the purpose of making such repairs. If, within thirty (30) days after said notice to Lessor of the casualty damage, Lessor does not notify Lessee in writing of Lessor's election to repair such damage, Lessee must elect by written notice to Lessor, within thirty (30) days after expiration of Lessor's option period, (a) to repair such damage promptly and diligently; or (b) to terminate this Lease and to surrender all insurance proceeds to Lessor. If either party elects to repair such damage, the Premises shall be rebuilt and restored by the electing party or its agent at its own cost to a condition, at least as good as the condition of the Premises immediately prior to said casualty; and the party actually electing and making such repairs shall be entitled to use the full amount of the insurance proceeds in connection therewith. Within 70 days after such damage occurs, if neither party has elected to repair such damage, then this Lease shall terminate; and all insurance proceeds shall be surrendered to Lessor to be used at Lessor's sole discretion for any purpose.

(b)    Rent After Casualty. If the damage and/or the repairs necessitated thereby make it impracticable or impossible for Lessee to resume normal, full-scale business operations on the Leased Premises within 24 hours after such damage occurs, rentals accruing hereunder after the expiration of such 24-hour period shall be adjusted as follows: (1) If Lessee's business operations can reasonably be continued on a curtailed or limited basis, the rentals hereunder shall be reduced in proportion to the reduction in Lessee's business volume, measured in terms of gross receipts; or (2) if Lessee's business operations cannot reasonably be conducted on a curtailed or limited basis, the rentals hereunder shall be abated entirely until Lessee's normal full-scale business operations may be resumed; provided, however, that in no event shall rentals be adjusted or abated under this provision except for a period of more than ninety (90) days, unless the repair and reconstruction is delayed because of events outside of the reasonable control of the party responsible for said repair or reconstruction, in which event, the rentals shall be adjusted or abated during the period of the additional delay; notwithstanding anything herein contained to the contrary, in the event that Lessor is the party responsible for the repair and reconstruction, if said repair is not completed within 180 days after the date of the fire or other casualty, Lessee shall have the option of terminating the Lease as of said date, with an abatement of rent from the date that the Premises were rendered untenantable.

(c)    Waiver of Subrogation. Lessee hereby releases Lessor from any and all liability or responsibility to Lessee, or anyone claiming through or under Lessee, by way of subrogation, or otherwise, for any loss or damage to property caused by fire or any of the extended coverage supplementary contract casualties; provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as releasor's policy shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair such policy or prejudice the rights of the releasor to recover thereunder. Lessee agrees that it will request its insurance carrier to include in such policy, such a clause dealing with waiver of subrogation.

7

17.    CONDEMNATION.

(a)    If a portion of the demised premises shall be taken as herein provided for public improvements or otherwise under the exercise of the right of eminent domain and the Premises shall continue to be reasonably suitable for the use which is herein authorized, then the rental herein provided shall be reduced from the date of such taking in direct proportion to the reduction in usefulness of the premises.

(b)    If the Leased Premises or a part thereof sufficient to render the Leased Premises wholly unfit for the use herein authorized shall be condemned or acquired by grant or otherwise, for the widening of streets or for other public improvements, or shall otherwise be taken in the exercise of the right of eminent domain, Lessee shall have the right, at Lessee's option, to terminate and cancel this Lease on thirty days written notice to Lessor, and, under this Lease, Lessee shall be liable only for rents and other charges accrued and earned to the date of surrender of possession of said premises to Lessor and for the performance of other obligations maturing prior to said date.

(c)    Lessee shall not be entitled to participate or receive any part of the damages or award which may be paid to or awarded Lessor by reason of a taking under this paragraph except where said award shall provide for moving or other reimbursable expenses for the Lessee under applicable statute in which event the latter sum shall be received by Lessee.

18.    SIGNS.  Lessee shall not place on any exterior door, wall or window, or any other part of the Premises any sign or advertising matter without first obtaining Lessor's written approval and consent.  Lessee agrees to maintain such sign or advertising matter as provided by Lessor in good condition and repair.  All signs shall comply with applicable ordinances or other governmental restrictions and the [illegible] requirements and the prompt compliance therewith shall be the responsibil[illegible].

19.    DEFAULT.  If Lessee shall be declared bankrupt, be placed in receivership or take advantage of any law for the relief of debtors, or if Lessee should default in the performance of any covenant or condition of this Lease (except for default in the payment of any rent or other amount due to Lessor hereunder, and such default is not cured within ten (10) days after Lessor's service of written notice of default upon Lessee), and such default is not cured or removed within thirty (30) days after Lessor's service of written notice of default upon Lessee, Lessor shall have the right and option to pursue all of its legal remedies including, without limitation, the right to terminate this Lease, to re-enter the Premises, to evict Lessee and to remove Lessee's possessions, all without being deemed guilty of any trespass and without prejudice to any claim by Lessor for damages for breach of this Lease or for arrears of rent or any other amounts due hereunder.

Waiver by Lessor of any default, breach or failure of Lessee under this Lease shall not be construed as a waiver of any subsequent or different default, breach or failure.  In case of a breach by Lessee of any of the covenants or undertakings of Lessee, Lessor nevertheless may

8

accept from Lessee any payment or payments hereunder without in any way waiving Lessor's right to exercise the right of re-entry hereinbefore provided for by reason of any other breach or lapse which was in existence at the time such payment or payments were accepted by Lessor.

20.   HOLDING OVER. In the event Lessee continues to occupy the Premises after the last day of the Initial Term, or any Extended Term, and Lessor elects to accept rental thereafter, a tenancy from month to month shall be created at the same rental and upon the same other terms and conditions existing on the last day of the Initial Term or Extended Term as herein provided.

21.   LESSOR'S RIGHT OF ENTRY. After twenty-four (24) hours advance or written notice to Lessee, Lessor reserves the right at all reasonable times during the term of this Lease, or any renewal term, for Lessor or Lessor's agents to enter the Premises for the purpose of inspecting and examining the same. During the ninety (90) days prior to the expiration of the term of this Lease or any renewal term, Lessor may exhibit the Leased Premises to prospective lessees or purchasers, and place upon any part of the Premises the usual notices advertising the Premises, or any part thereof, for sale or lease, as the case may be; which notices Lessee shall permit to remain thereon without molestation. If Lessee's agents or employees are not personally present to open and permit an entry into the building on the Premises, or the Leased Premises, at any time, when in emergency situations entry therein shall be necessary, Lessor or Lessor's agents may enter the same by a master key, or may forcibly enter the same, without rendering Lessor or such agents liable therefor, and without in any manner affecting the obligations and covenants of this Lease. Nothing herein contained, however, shall be deemed or construed to impose upon Lessor any obligation, responsibility or liability whatsoever for the care, maintenance or repair of the Premises or any part thereof, except as otherwise herein specifically provided.

22.   ASSIGNMENT. Lessee shall not assign or let or encumber this Lease without the prior written consent of Lessor, which shall not be unreasonably withheld, and shall not sublet or allow any other lessee to come in with or under Lessee without like prior written consent which shall not be unreasonably withheld. Consent of Lessor to one assignment or subletting of the Leased Premises shall not constitute a waiver of Lessor's rights hereunder. Any assignment or subletting, notwithstanding the consent of the Lessor, shall not in any manner release the Lessee herein from its continued liability for the performance of the provisions of this Lease and any amendments or modifications. The acceptance of any rental payments by Lessor from any alleged assignee shall not constitute approval of the assignment of this Lease by the Lessor. Notwithstanding the above, if Lessee is acquired by or merged with and into another entity (the "Successor"), this Lease Agreement shall continue, without Lessor's consent, with the Successor.

23.   BANKRUPTCY, ETC. Neither this Lease, nor any interest therein, nor any estate created hereby, shall pass to any trustee or receiver in bankruptcy, nor to any other receiver or assignee for the benefit of creditors or otherwise by operation of law. In the event of bankruptcy or assignment for the benefit of creditors, the Lessor shall be deemed a secured creditor as to the next six months' rental to the extent permitted by the applicable federal or state laws unless a

9

Lessee paying at least the amount due from Lessee shall be procured in such period. As to any additional loss of rent, Lessor shall be entitled to file as a general creditor.

24. **ENFORCEMENT.** In the event either party to this Lease obtains legal counsel to enforce any right under this Lease or to obtain relief for the breach of any term, condition or covenant herein, the party ultimately prevailing in such proceedings shall be entitled to recover from the other party the reasonable costs and expenses of such proceedings, including reasonable attorney fees, whether or not a lawsuit is actually filed.

25. **NOTICES.** Any notice given hereunder shall be in writing and may be sent by certified or registered mail, postage prepaid, addressed to the party to receive same at the address of such party shown on the signature page hereof or such other address as such party may hereafter furnish to the other in writing. Any notice mailed in accordance with the preceding sentence shall be deemed to have been served at the time it is received.

26. **EXECUTION.** This Agreement may be executed in multiple originals as of the date first above written and shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors, assigns and legal representatives. Subject to Section 22 hereof, the rights of either party hereto may be assigned in whole or in part; but no such assignment shall relieve the assignor of any liability hereunder. If Lessee herein shall be more than one party, then the obligations of such parties herein shall be joint and several. The paragraph captions used herein are for convenience only and shall not be deemed to have been included for any other purpose.

27. **RIGHT OF FIRST REFUSAL TO PART OR ALL OF THE REAL ESTATE.** If, during the Initial Term or Extended Term of this Lease, the Lessor desires to sell part or all of the real estate described on Exhibit __, Lessee shall have a right of first refusal to purchase part or all of the Real Estate, according to the following terms.

(a) _Third Party Offer._ If, at any time during the term hereof, Lessor: (i) desires to sell part or all of the Real Estate; and (ii) receives from a third party a bona fide offer for the purchase thereof which offer Lessor is willing to accept ("Bona Fide Offer"), then Lessor shall disclose the terms of such Bona Fide Offer to Lessee by providing Lessee with a photocopy of such Bona Fide Offer within seven (7) days following Lessor's receipt thereof.

(b) _Solicited Offer._ If, at any time during the term hereof, Lessor: (i) desires to sell part or all of the Real Estate; (ii) intends to seek a Bona Fide Offer from a third party; and (iii) has established a minimum price and terms therefore ("Solicited Offer"), then the Lessor shall disclose such Solicited Offer to Lessee in writing at least thirty (30) days before such Solicited Offer is sought from a third party.

(c) _Purchase._ Lessee shall have fourteen (14) days after being given notice of the Bona Fide Offer or Solicited Offer, as the case may be ("Notice of Offer"), within which to elect to purchase such part or all of the Real Estate described in the Bona Fide Offer or Solicited

10

Offer, as the case may be, on terms identical to those offered by the third party or to be solicited ("Election Period"). Lessee shall make such election by giving written notice thereof to the Lessor ("Election Notice") within the Election Period. Within fourteen (14) days thereafter, the parties shall enter into a formal contract for sale containing the provisions normally used in such contracts in Marion County, Missouri and expressly including all of the terms of the original Bona Fide Offer or Solicited Offer except as the parties may otherwise mutually agree.

(d)    <u>Failure to Purchase.</u> The following shall apply should Lessee fail to exercise its right of first refusal after receiving a Notice of Offer as set forth above:

(i)    <u>Bona Fide Offer.</u> If Lessee fails to give the Election Notice as provided in subparagraph 27(c)(iii) above, with respect to a Bona Fide Offer, the Lessor shall be relieved of any obligation to Lessee hereunder and may dispose of part or all of the Real Estate in accordance with the Bona Fide Offer. If the sale to the third party per the Bona Fide Offer is not closed for the same price and upon the same terms as set forth in the Bona Fide Offer or within six (6) months after expiration of the Election Period, then this right of first refusal shall be deemed reinstated and part or all of the Real Estate shall remain subject to this Lease as if no Bona Fide Offer had been made.

(ii)    <u>Solicited Offer.</u> If Lessee fails to give the Election Notice as provided in subparagraph 27(c)(iii) above, with respect to a Solicited Offer, the Lessor shall be relieved of any obligation to Lessee hereunder, it may dispose of part or all of the Real Estate within one (1) year after the expiration of the Election Period provided the material terms and conditions of the Solicited Offer are followed. If the terms and conditions for the Solicited Offer are not followed or the sale consummated in accordance therewith within such one year period, this right of first refusal shall be deemed reinstated. In connection therewith, this right of first refusal shall apply as to any lower price or materially different terms and conditions from those provided in the Solicited Offer of which Lessee was given a Notice of Offer. In short, the Lessor shall not be entitled to accept less than the purchase price established and subject to the material terms of the Solicited Offer or to close a sale based thereon more than one (1) year after the expiration of the Election Period without again extending to Lessee this right of first refusal.

28.    <u>RIGHT OF FIRST REFUSAL TO INTEREST IN LINDAN, L.L.C.</u> If, during the Initial Term or Extended Term of this Lease, any member of Lindan, L.L.C. desires to sell any or all of his, her or their interest in Lindan, L.L.C., the other members of Lindan, L.L.C. shall proportionately have a right of first refusal to purchase that interest, according to the same terms as the Right of First Refusal for part or all of the Real Estate detailed above, and if none of the members make the Election Notice within the Election Period to purchase the selling member's or members' interest in Lindan, L.L.C., Lessee shall then be given the Notice of Offer and thereafter have the Election Period to deliver the Election Notice to the selling member or members of Lindan, L.L.C. to purchase his, her or their interest in Lindan, L.L.C.

29.  **MISCELLANEOUS.**

(a)  **No Partnership.** It is understood that Lessor does not in any way or purpose become a partner or a joint venture with Lessee in the conduct of Lessee's business.

(b)  **Partial Invalidity.** If any term or condition of this Lease or the application thereof to any person or event shall to any extent be invalid and unenforceable, the remainder of this Lease in the application of such term, covenant or condition to persons or events other than those to which it is held invalid or unenforceable shall not be affected and each term, covenant and condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(c)  **Successors.** Subject to Section 22 hereof, the provisions, covenants and conditions of this Lease shall bind and inure to the benefit of the legal representatives, successors and assigns of each of the parties.

(d)  **Supercede Prior Lease.** This Lease Agreement shall supercede and replace the Lease Agreement dated January 1, 2009 by and between Lessor and Linda Cooke Dermatology, P.C., d/b/a Riverside Dermatology.

(e)  **Applicable Law.** This agreement and each and every part thereof shall be construed in accordance with the laws of the State of Illinois.

SIGNATURES ON FOLLOWING PAGE

12

LESSOR
LINDAN, L.L.C.,
A Missouri Limited Liability Corporation,


By:_____

8795 CR 418
Hannibal, MO 63401


LESSEE
Quincy Physicians & Surgeons Clinic, S.C.,
doing business as QUINCY MEDICAL
GROUP, an Illinois Medical Corporation,


By:_____

1025 Maine
Quincy, IL 62301


The undersigned as Lessee under Lease
Agreement dated January 1, 2009 signs to
affirm agreement to this Lease Agreement.

LINDA COOKE DERMATOLOGY, P.C.
d/b/a Riverside Dermatology


By:_____
Linda M. Cooke, its _____


The undersigned Members of Lindan, L.L.C.
sign to affirm their agreement to Sections 27
and 28 of this Lease Agreement.


_____
Linda M. Cooke, Member, Lindan, L.L.C.


_____
____ Cooke, Member, Lindan, L.L.C.


_____
Patricia Terstriep, Member, Lindan, L.L.C.
6930 Horseshoe Valley Road
Quincy, IL 62305


_____
Luke Terstriep, Member, Lindan, L.L.C.
6930 Horseshoe Valley Road
Quincy, IL 62305


13

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

EXHIBIT A

SITE PLAN

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

## EXHIBIT B

## LEGAL DESCRIPTION

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

Exhibit B

All of Lot Five (5) In B. & B. Subdivision, a subdivision lying in the Northeast Quarter (NE-1/4) of the Southwest Quarter (SW-1/4) of Section Twenty-Seven (27), Township Fifty-Seven (57) North, Range Five (5) West, City of Hannibal, Marion County, Missouri, per plat recorded in Plat Book 9, page 31, Marion County Records.

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

*Exhibit "C"*

## ASSOCIATE PHYSICIAN EMPLOYMENT AGREEMENT

THIS AGREEMENT is made effective December 6, 2010, between Quincy Physicians & Surgeons Clinic, S.C., an Illinois medical corporation, d/b/a Quincy Medical Group, with its offices located at 1025 Maine Street, Quincy, Illinois, hereinafter termed "Employer," and **LINDA COOKE, M.D.**, hereinafter termed "Employee."

WITNESSETH:

WHEREAS, the Employee has previously owned and practiced medicine in a solo practice in Hannibal, Missouri; and

WHEREAS, the Employee desires to accept employment to practice medicine as Associate Physician-Employee of the Employer; and

WHEREAS, the Employer and the Employee have agreed to the terms of such employment;

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements hereinafter contained, the parties hereto agree as follows:

1.  **EMPLOYMENT.** The Employer hereby employs the Employee, and the Employee hereby accepts employment from the Employer upon the terms and conditions set forth.

2.  **TERM.** The term of this Agreement shall begin on the 30th day of December 2010, (the "Practice Commencement date"), and shall continue until December 31, 2011, and from calendar year to calendar year thereafter, subject, however, to termination at any time for any reason upon sixty (60) days prior written notice by either the Employer to the Employee or the Employee to the Employer, unless otherwise limited by this Agreement. In addition, and in way of limitation hereof, this Agreement may be immediately terminated by the Employer upon the occurrence of any one or more of the following events:

(a)  The failure of the Employee to comply with the Employer's rules and regulations, Code of Conduct, Compliance Program or Compliance Policies and Procedures;

(b)  Suspension or revocation of Employee's license to practice medicine in the State of Missouri;

(c)  Employee's professional misconduct or Employee's violation of the canons of professional ethics;

(d)  The inability of the Employer to secure malpractice insurance coverage for the Employee;

1

(e)     The failure of the Employee to become American Board certified within the requirements of his/her specialty; and

(f)     The death of the Employee.

3.     COMPENSATION.

(a)     For all services rendered by the Employee under this Agreement up to and including December 31, 2011, the Employer shall pay to Employee the greater of (i) an annual salary of Four Hundred Eighty Thousand Dollars ($480,000) or (ii) the amount the Employee would have earned under the Employer's income distribution formula (compensation plan) for its shareholders, as if Employee was a shareholder of Employer. Such compensation shall be payable in the manner determined by the Board of Directors of Employer.

(b)     After December 31, 2011, for all services rendered by the Employee under this Agreement, the Employer shall pay the Employee, as if he/she was a shareholder of Employer, such compensation based on the Employee's professional service charges and collections as is determined in accordance with the Employer's income distribution formula (compensation plan) for its shareholders. Such compensation shall be payable in the manner determined by the Board of Directors of Employer.

(c)     The Employer will maintain a copy of the income distribution formula in effect from time to time on file in corporate administrative offices for the Employee's review.

(d)     Upon the termination of this Agreement for any reason whatsoever, the Employer shall pay to the Employee, or in the event of the Employee's death to his/her estate, compensation earned to the date of termination or the date of death, as the case may be.

4.     DUTIES.  The Employee accepts employment in the practice of medicine in which the Employer is engaged in the specialty of Dermatology.

The Employee shall have such duties as the Board of Directors of the Employer shall from time to time designate for him/her.

In addition, the Employee is empowered to actively practice medicine on behalf of the Employer. The Employee will not engage in the practice of medicine except as an Employee of the Employer unless otherwise authorized by Employer. The Employer shall have the power to determine what specific duties shall be performed by the Employee. The Employer shall have the power to determine the assignment of patients to the Employee, and the Employee must perform services for the patients assigned to him/her by the Employer.  The power to direct, control and supervise the duties to be performed, the manner of performing said duties, and the terms for performing said duties, shall be exercised by the Employer.  In performance of the Employee's duties, the Employee agrees to follow the performance and availability standards set by the Board of Directors of the Employer from time to time.

2

Duties herein shall in all events be consistent with the general practice of medicine and the Employee's area of specialty, and shall be performed in accordance with the customary rules of ethics and conduct of the American Medical Association and such other bodies, formal, informal, governmental or otherwise to whom they look for direction, guidance, and to whom they are subject for licensing and control.

5. <u>COVENANTS OF EMPLOYEE.</u> The Employee agrees as follows:

(a) Employee shall abide by and comply with the rules and regulations, Code of Conduct, Compliance Program, and Compliance Policies and Procedures of the Employer, as each may be amended and in effect from time to time. The Employee shall attempt to work harmoniously with all employees of the Employer and shall support the maintenance of a supportive working environment. The Employee shall not engage in conduct which damages the reputation of the Employer, which portrays negatively the business policies or decisions of the Employer or which affects adversely the performance of other employees of the Employer.

(b) During the term of this Agreement, the Employee shall not, without prior written consent of the Employer, which consent may be withheld at the sole discretion of the Employer, engage in or in any manner be connected or concerned, directly or indirectly, whether as an officer, director, stockholder, partner, owner, employee, creditor, or otherwise, with the operation, management, or conduct of any business that competes with or is of a nature similar to that of the Employer;

(c) During the term of this Agreement, and following the termination hereof for any reason, the Employee shall not make any use, for his/her own benefit or for the benefit of a business or entity other than the Employer, of any confidential information, client, patient, or customer lists, or in any other data of or pertaining to the Employer, its business and financial affairs, or its services, not otherwise known to the general public, and which was acquired by him/her during his/her affiliation with the Employer;

(d) To maintain in good standing the Employee's license to practice medicine in the State of Illinois.

(e) To maintain in good standing the Employee's privileges to practice medicine in the hospital in Hannibal, Missouri, or in any other hospital in which the Employer requests that the Employee have privileges to practice medicine;

(f) To cooperate fully with any special advisory committee appointed by the Board of Directors of Employer to evaluate and review the professional conduct or performance of the Employee or of another physician-employee of the Employer; and

(g) To adhere to any standards of practice and disciplinary sanctions established by the Board of Directors of the Employer.

3

6.     <u>PROFESSIONAL LIABILITY INSURANCE.</u>  While Employee is employed by Employer, Employer shall provide professional liability insurance under a claims-made policy for the Employee covering the acts or omissions of the Employee in the normal course of his/her employment. Employer's obligation to provide such insurance shall cease upon Employee's termination of employment with Employer. The limits of such insurance coverage shall be in an amount per occurrence and aggregate as the Employer determines from time to time. Employer is not responsible for providing professional liability insurance covering the Employee for claims made for Employee's acts or omissions which occurred prior to the date of Employee's employment with Employer. If the employment of Employee by Employer under this Agreement is terminated for any reason with or without cause, Employee shall be responsible for and make payment for all of the premium for Employee's tail insurance coverage, including, but not limited to, that portion of the insurance premium that will cover any claims which are made against Employee after Employee's termination of employment hereunder and which pertain to the Employee's acts or omissions while he was employed by Employer.

7.     <u>VACATIONS AND PROFESSIONAL MEETINGS.</u>  The Employee shall be granted three weeks time for vacation and up to two weeks for attendance at professional meetings. Neither vacation time nor professional meetings time may be accumulated from year to year. Employee's vacation and meeting attendance will be approved by the Medical Director and scheduled at such time as will least interfere with the business of Employer.

8.     <u>EMPLOYEE BENEFITS.</u>  As an Employee of Employer, Employee shall, upon meeting any applicable eligibility and enrollment requirements, be entitled to participate in any qualified retirement, cafeteria, health, accident, or other employee benefit plan, as Employer may have in effect from time to time.

9.     <u>EXPENSES.</u>  Employee understands and acknowledges that Employee shall incur and personally pay certain necessary expenses which are attributable to the performance of Employee's duties hereunder but which may or may not be reimbursed by Employer, such as automobile and transportation expenses; professional entertainment and promotional expenses; home telephone bills; costs of maintaining facilities for consultation with and treatment of patients in Employee's home; educational expenses incurred for the purpose of maintaining or improving Employee's professional skills; club dues and expenses of membership in civic groups, medical societies and fraternal organizations; computer; and all other items of reasonable and necessary professional expenses incurred by Employee in the interest of the medical practice of Employer.

10.     <u>FEES.</u>  All fees, compensations, or other things of value received or realized as a result of the rendition of professional medical services and related services by Employee shall belong to and be paid and delivered to the Employer.

11.     <u>PROHIBITION AGAINST ASSIGNMENT.</u>  This Agreement and all rights and benefits hereunder are personal to Employee, and neither this Agreement, nor any right or interest of Employee herein, or arising hereunder, shall be voluntarily or involuntarily sold, transferred or assigned.

12.     <u>FILES AND RECORDS.</u>  All files and records produced and created by Employee in connection with this Agreement shall belong to and remain the property of

4

Employer. On termination of this Agreement, Employee shall not be entitled to keep or reproduce such files and records, unless the person, firm or corporation relative to which the services were performed requests that a copy be provided to Employee. In such case, Employee shall be required to pay the cost of reproducing any files and records.

13.    COVENANT NOT TO COMPETE.

(a)    Employee acknowledges and agrees that the Employer will incur significant expenses in promoting the medical practice of the Employee. Further, Employee acknowledges that Employee will develop goodwill and a patient following due primarily to the Employer. The Employee, as a material inducement to other physician-employees of the Employer to become employed by the Employer and, as a material inducement for the Employer to employ the Employee, enters into the following covenant for the purpose of protecting the goodwill and patient following of the Employer, and for other good and sufficient reasons in the event the Employee's employment with the Employer is terminated. This covenant is considered reasonable by Employee, and Employee acknowledges that the restraint hereby imposed would not be injurious to the public because the Employee's services could be equally useful to the public interest in some location other than the prohibited area, and the enforcement hereof would not result in the public in such area having inadequate medical protection.

(b)    Except as provided in subparagraph (k) of this paragraph 13, Employee covenants and agrees that if he/she terminates his/her employment with Employer for any reason, or Employer terminates Employee pursuant to paragraph 2, subparagraphs (a), (b), (c), (d), or (e) Employee will not for two (2) years commencing with the employment termination date engage in, or become associated with, directly or indirectly (whether as an owner, employee, partner, officer, director, advisor, stockholder, creditor, landlord, or any other capacity), either solely or jointly with others, any business or other activity which is in any way competitive with the business or allied businesses of the Employer within twenty-five (25) miles of the corporate limits of the City of Hannibal, Marion County, Missouri, as now or hereafter existing, or engage in the practice of medicine within such territory.

(c)    If the Employer shall institute any action or proceeding to enforce the above covenant or any part thereof, or if said covenant or any part is deemed unenforceable by the court or other tribunal having jurisdiction over such action or proceeding, the Employee agrees that (i) the covenant or any part shall be deemed "rewritten" and modified to the extent necessary to render the same enforceable by such court or other tribunal, or (ii) if such court or other tribunal will not so "rewrite" the covenant, then said covenant shall be modified by the Employer and Employee to the extent necessary to render it enforceable under the laws of the State of Illinois or the State of Missouri, as the case may be.

(d)    Employee hereby acknowledges that the obligations to the Employer hereunder and the rights and privileges granted to the Employer hereunder are of a special, personal, unique and extraordinary character. Therefore, anything herein to

5

the contrary notwithstanding, the Employer shall be entitled to seek injunctive or other equitable relief in an appropriate court to prevent a further breach by the terminated Employee. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights and remedies that the Employer may have for damages or otherwise.

(c)     Employer and Employee acknowledge that in the event of a violation of this covenant, the damages caused by such breach are incapable or very difficult of accurate estimation. As a reasonable forecast of just compensation caused by a breach, the Employer and Employee have agreed upon liquidated damages as herein provided.

(f)     In the event the Employee fails to strictly observe this covenant, the Employee shall be liable for liquidated damages which equal fifty percent (50%) of the average of the last three (3) years earnings of such Employee from the Employer (or average of the number of years or partial years Employee is employed by Employer if less than three (3) years) for each year, or part thereof, of the two (2) year non-compete period immediately following the termination date, during which such terminated employee shall violate the terms of this covenant.

(g)     The payment of liquidated damages as provided for above shall not limit any right to injunctive or other equitable relief for further or continued breach of the covenant. In the event that this covenant is breached after such injunctive or equitable relief is obtained, the Employer and Employee agree that the Employer may recover from the Employee a sum equal to the liquidated damages provided for above.

(h)     The Employer reserves the right to withhold any liquidated damages of the terminated Employee violating the covenant to the extent possible from any amount due to the terminated Employee pursuant to the terms hereof and apply any amount withheld to such obligation.

(i)     The Employer acknowledges that this covenant is intended only to apply to an Employee who voluntarily terminates or retires, and to an Employee whose employment is immediately terminated by Employer upon the occurrence of one of the events set forth in paragraph 2, subparagraphs (a), (b), (c), (d), or (e). It is not intended that it will apply to an Employee who is terminated by the Employer upon giving sixty (60) days notice as provided in paragraph 2. The Employer and Employee consider this distinction reasonable.

(j)     The Employee understands that these are restrictive covenants and fully agrees to their applicability. In the event that the Employee violates any of these restrictive covenants, then in any suit which may be brought by the Employer for the violation of these provisions in any court having jurisdiction, then in such respect, the Employee agrees that an order may be made in such suit enjoining him/her from violating said provisions, and an order to that effect may be made pending the litigation as well as a final determination thereof, without the requirement to post bond, and furthermore that such application for such injunction

6

shall be without prejudice to any other right of action which may accrue to the Employer or its successors by reason of the breach of these provisions. If the Employee is found to have violated this Agreement and the Employer prevails in an action to enforce the terms of this Agreement, the Employee shall pay to the Employer its reasonable attorneys' fees and costs incurred by the Employer in prosecuting such action.

(k)     Notwithstanding subparagraph (b) of this paragraph 13, the Employee shall not be restricted upon termination of employment from returning to a solo practice of medicine in Hannibal, Missouri similar to the practice which Employee owned prior to becoming employed by Employer pursuant to the terms of this Agreement. However, if Employee during the two (2) year period from the termination of her employment by Employer practices medicine within the restricted territory in a practice other than a solo practice, the Employee shall be held to the covenant set forth in this paragraph 13 for such period of time as Employee is in violation of the covenant restrictions.

14.     WAIVER OF BREACH. The waiver of either Employer or Employee of a breach of any provision of this Employment Agreement shall not operate or be construed as a waiver of any subsequent breach by either Employer or Employee.

15.     NOTICE. Any and all notices, designations, offers, acceptances or any other communication provided for herein shall be given in writing by registered or certified mail, return receipt requested, which shall be addressed, in the case of the Employer, to its registered office in the State of Illinois and in the case of Employee, to his/her last known place of residence as reflected on the Employer's records. E-mail may be used where agreed to by the Employee and the Employer. The Employer and Employee will use "a request for a read receipt" option when sending a notice by e-mail to the other. Upon receipt of an e-mail requesting a "read receipt" the receiving party, whether it be the Employer or Employee, agrees to have returned to the sender the "read receipt" so that the sender will have written confirmation that the notice by e-mail was received by the receiving party.

16.     GOVERNING LAW. This Agreement shall be subject to and governed by the laws of the State of Illinois, irrespective of the fact that Employee is a resident of a different state.

17.     BINDING EFFECT. This Agreement shall be binding upon and inure to the benefit of the Employer and Employee and their respective heirs, legal representatives, successors, executors, administrators and assigns.

18.     SEVERABILITY. If any portion or portions of this Agreement shall be, for any reason, invalid or unenforceable, the remaining portion or portions shall nevertheless be valid, enforceable and carried into effect, unless to do so would clearly violate the present legal and valid intention of the parties hereto.

19.     AMENDMENTS. No amendments or variations of the terms and conditions of this Employment Agreement shall be valid unless the same is in writing and signed by Employer and Employee.

IN WITNESS WHEREOF, this Employment Agreement has been executed by Employer and Employee as of the date first above written.

EMPLOYER:

Quincy Physicians &
Surgeons Clinic, S.C.,
d/b/a Quincy Medical Group                    Attest:

By _____
Dan H. Evans, M.D.
Its Chairman


EMPLOYEE: _____Linda Cooke MD_____
Linda Cooke, M.D.

Date:        12 - 15 - 2010

This agreement will expire unless the above two signatures are executed by ~~December 10, 2010~~ DECEMBER 20, 2010

SEE ATTACHED EMAIL DATED 13 DEC 2010 FROM
CAROL LEWIS RE: ADDITIONAL ITEMS TO BE CONSIDERED.
DMC

8

Electronically Filed - Marion Hannibal - September 25, 2018 - 03:10 PM

From:      "Lewis, Carol" <CLewis@quincymedgroup.com>
Subject:   FW: Dr. Cooke
Date:      Mon, December 13, 2010 8:28 pm
To:        lindamariemd@gmail.com,danielecooke@gmail.com,delmcooke@rallstech.com

---

Linda and Dan, please see attached a very comprehensive explanation of the compensation plan for physicians. I think this will address the first item on your list of when does the extra pay kick in and under what circumstances, including how ancillaries are handled.

Other items we talked about, since Friday, so that they are in one email:

- Lease - attached. As we discussed, you have first right of refusal if Patty and Luke sell, and I have asked the attorney to make that revision. Conversely, I will ask Patty and Luke if they want the same if you sell (knowing that is highly unlikely). QMG is only interested in ensuring that we receive "second" right of refusal before either party would sell to an outside party. The other item in the lease that I couldn't remember the other day is that it terminates if/when Dr. Cooke leaves QMG.
- Discounts and/or free products/services may be given to anyone that Dr. Cooke (or the NP's) deem appropriate, for fee-for-service services. This is what we do now in Plastics/Med Spa, and the same is true of your practice. Insurance services are of course different and cannot be discounted as a rule.
- Vacation/CMEs - there is no policy currently in place regarding physicians taking vacations and/or CMEs. They are not required to seek permission from anyone. As Aric has said, once your base is met, your production, days out, and CMEs is up to you and the impact it may or may not have on your compensation.
- When the NPs join, the addition of their nurse(s) will be your joint decisions. We have some physicians who want full control, some who only want a few screened applicants from which to choose, and others who want a qualified person to be chosen for them. This is yours to decide, and HR will support and coordinate whatever efforts you need.
- In general, staff for physicians are not hired without physician input, and the typical process when a doc wants to add someone is for the request to be made, we post a job desc for internal applications, run outside ads, and go from there based upon physician involvement. Conversely, when/if anyone needs to be fired, we follow a general protocol to make sure the physician is aware, involved, protected, or driving the process if its at his/her request. HR can often be a defender, driver, supporter, or instigator if the physician wants to be isolated. Again, its up to your comfort level, but everyone on our end understands how very important staff satisfaction is to you. I would say the same is true for most of our docs. Annual eval performances are given with physician involvement on scores and outcomes as well.
- 401K match - yes signing by the end of this year ensures a match for 2011, after the one-year employment.
- Dan passed me the staff names, salaries, and status today so I am running a quick check against our pay ranges to identify any outliers and we'll get those addressed soon. Only one that jumps out at me is the coder/biller, so I'll keep you posted what that looks like. More on staff and pay in coming day.

Let me know what else we need to wrap up.
Thanks,
Carol

-----Original Message-----
From:  Williamson, Patty
Sent:  Monday, December 13, 2010 3:26 PM
To:    Lewis, Carol
Subject:  RE: Dr. Cooke

Let me know if you need anything else. Patty

<<Phys compensation Plan - QMG DRAFT (8-16-06).DOC>>

    Thanks,

    Patty



## IN THE 10TH JUDICIAL CIRCUIT, MARION COUNTY, MISSOURI

*SB 10-7*

| | |
|---|---|
| **Judge or Division:**<br>RACHEL BRINGER SHEPHERD | **Case Number: 18MR-CV01135** |
| **Plaintiff/Petitioner:**<br>LINDA COOKE MD and LINDAN LLC | **Plaintiff's/Petitioner's Attorney/Address**<br>JAMES F LEMON<br>LEMON LAW FIRM, LLC<br>119 SOUTH 10TH ST<br>HANNIBAL, MO 63401 |
| vs. | |
| **Defendant/Respondent:**<br>QUINCY PHYSICIANS & SURGEONS CLINIC | **Court Address:**<br>906 BROADWAY<br>HANNIBAL, MO 63401 |
| **Nature of Suit:**<br>CC Declaratory Judgment | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: QUINCY PHYSICIANS & SURGEONS CLINIC
Alias:

C/O CT CORPORATION
120 S CENTRAL AVE
CLAYTON, MO 63105

**COURT SEAL OF**

*30 CT COR*

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

**MARION COUNTY**

| | |
|---|---|
| September 7, 2018<br>Date | /s/ Carolyn J. Conners<br>Clerk |

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☑ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: *LOW-A. BRANDON* (name) *INTAKE SPEALIST* (title).

☐ other: _____

Served at *CT CORP* _____ (address)
in *St. Louis County* (County/City of St. Louis), MO, on *UCI U3 2018* (date) at _____ *8 AM* (time).

*Rochell Huey*
Printed Name of Sheriff or Server

*Huey*
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
Date

SEP 2 8 2018
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $ 10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For method of service on all classes of suits, see Supreme Court Rule 54.

2018 SEP 28 PM 3:41
ST. LOUIS COUNTY
SHERIFF'S OFFICE
RECEIVED

*18-SMCC-8195*

OSCA (06-18) SM30 (SMCC) *For Court Use Only:* Document Id # 18-SMCC-192     1 of 1

Civil Procedure Form No. 1; Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo



Search for Cases by: Select Search Method...

Judicial Links | eFiling | Help | Contact Us | Print

Logon

## 18MR-CV01135 - LINDA COOKE MD & LINDAN V QUINCY PHYSICIANS CLINIC (E-CASE)

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

Sort Date Entries: ● Descending ○ Ascending      Display Options: All Entries

---

**10/04/2018**

**Return Service - Other**
Document ID - 18-SMCC-192; Served To - QUINCY PHYSICIANS & SURGEONS CLINIC; Server - SO ST LOUIS COUNTY-CLAYTON; Served Date - 03-OCT-18; Served Time - 09:00:00; Service Type - Sheriff Department; Reason Description - Served; Service Text - ABODE LCW-A.BRANDON. INTAKE SPECIALIST

**Notice of Service**
18-SMCC-192; Electronic Filing Certificate of Service.

**09/25/2018**

**Amend Pet/Mot to Modfy Filed**
Petition amended; Exhibit A; Exhibit B; Exhibit C.
   **Filed By:** JAMES F LEMON

**09/07/2018**

**Summons Issued-Circuit**
Document ID: 18-SMCC-192, for QUINCY PHYSICIANS & SURGEONS CLINIC. (Summons electronically submitted to attorney to forward for service to Defendant.)

**08/27/2018**

**Filing Info Sheet eFiling**
   **Filed By:** JAMES F LEMON

**Note to Clerk eFiling**
   **Filed By:** JAMES F LEMON

**Pet Filed in Circuit Ct**
Petition; Exhibit A; Exhibit B; Exhibit C.
   **Filed By:** JAMES F LEMON
   **On Behalf Of:** LINDA COOKE MD, LINDAN LLC

**Judge Assigned**

---